IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| RICHARD K. COOK, | |
| Petitioner, | **8:18CV332** |
| vs. | |
| BRAD HANSEN, Warden - TSCI; SCOTT FRAKES, Director - Nebraska; and DEPARTMENT OF CORRECTIONAL SERVICES, | **MEMORANDUM AND ORDER** |
| Respondents. | |

This matter is before the court on Petitioner Richard K. Cook's ("Petitioner" or "Cook") Petition for Writ of Habeas Corpus. (Filing No. 1.) For the reasons that follow, Petitioner's habeas petition is denied and dismissed with prejudice.

## I. CLAIMS

Summarized and condensed,[1] and as set forth in the court's prior progression order (filing no. 10), Petitioner asserted the following claims[2] that were potentially cognizable in this court:

Claim One:     Petitioner was denied effective assistance of counsel because trial counsel **(1)** failed to investigate DNA evidence by not hiring a DNA expert and failing to file a

---

[1] Petitioner did not object to the court's summary and condensation.

[2] For reference of the parties, the court cited to the pages of Petitioner's habeas petition from which it construed each of Petitioner's claims.

1

"Motion to Produce all Physical Evidence and DNA Material for Independent Testing" (filing no. 1 at CM/ECF pp. 25-27); (**2**) failed to motion the court for a continuance in order to further investigate Mike Hornbacher ("Hornbacher") after mixed DNA results were obtained from Hornbacher's DNA testing (*id.* at CM/ECF p. 25); (**3**) failed to object to the "lack of probable cause" testimony from Nebraska State Patrol ("NSP") Inv. Charlie O'Callahan (*id.* at CM/ECF pp. 25, 36); (**4**) failed to investigate and pursue evidence against Hornbacher prior to trial (*id.* at CM/ECF pp. 31, 36-37); (**5**) failed to move for a mistrial based on law enforcement's improper seizure and transportation of Petitioner from Iowa to Nebraska at time of his arrest (*id.* at CM/ECF p. 34); (**6**) failed to investigate or inform the trial court and prosecution that Douglas County Sheriff Captain Dan McGovern had discussed evidence from Petitioner's case in a class he taught at Iowa Western Community College (*id.* at CM/ECF p. 38); (**7**) failed to request a mistrial or removal of Prosecutor Leigh Ann Retelsdorf ("Retelsdorf") due to Retelsdorf's conflict of interest (*id.* at CM/ECF pp. 41-42); (**8**) failed to object and/or move for a mistrial as to the prosecution's use of Petitioner's invocation of his rights to remain silent and to counsel after his arrest and to testify on his own behalf in violation of the Fifth, Sixth, and Fourteenth Amendments (*id.* at CM/ECF p. 43); (**9**) failed to object and/or move for a mistrial as to Retelsdorf's misconduct in misrepresenting the DNA evidence and calling Petitioner a "rapist" and "manipulator" (*id.* at CM/ECF pp. 44, 67); (**10**) failed to prepare adequately for the Rape Shield Law hearing (*id.* at CM/ECF pp. 45, 68); (**11**) utilized and failed to object or move for mistrial as to untried, uncharged "prior bad acts" evidence (*id.* at CM/ECF pp. 47-49); (**12**) failed to effectively utilize investigative tools at counsel's disposal, such as a private investigator, and obtain missing evidence critical to the defense (*id.* at CM/ECF p. 52); (**13**) failed to object or move for a mistrial as to the following instances of prosecutorial misconduct: Retelsdorf vouching for

2

witness Hornbacher's credibility through a leading question, Retelsdorf eliciting testimony from Jeanette Cook that was contrary to the evidence, and the prosecution misstating Petitioner's testimony, the ballistic evidence, evidence regarding injuries to Hornbacher, and improperly instructing the jury on the law during closing arguments (*id.* at CM/ECF pp. 56-57, 74); **(14)** failed to make an offer of proof regarding Petitioner's excluded testimony about conversations he had with Hornbacher (*id.* at CM/ECF p. 60); **(15)** had Petitioner remove his suit jacket, show the shock belt restraint system to the jury, and explain how it worked when Petitioner took the stand to testify in his own defense (*id.* at CM/ECF p. 64); **(16)** withdrew from Petitioner's case after trial on the outright lie that counsel "was retiring from the practice of law" (*id.* at CM/ECF p. 66); **(17)** failed to show the jury an exhibit called "23 Reasons for Reasonable Doubt" that counsel had agreed with Petitioner to show during closing arguments (*id.* at CM/ECF p. 66); **(18)** failed to call multiple defense witnesses or the customer service representative that Hornbacher had lied to about his phone being stolen (*id.* at CM/ECF p. 66); **(19)** operated under conflicts of interest due to his prior representation of Janelle Elster, Petitioner's former girlfriend, and his connections to Douglas County Sheriff's Office Crime Scene Investigator Commander David Koefed ("Koefed") and the Douglas County Sheriff's Office (*id.* at CM/ECF pp. 25, 66); **(20)** refused Petitioner's request to play a videotape of Hornbacher giving a videotaped statement to NSP investigators (*id.* at CM/ECF p. 67); **(21)** stood silent and failed to object during the death penalty hearing when prosecutors did not stand silent (*id.* at CM/ECF p. 67); and **(22)** failed to request proper jury instructions (*id.* at CM/ECF pp. 71-74).

Claim Two:   Petitioner was denied effective assistance of counsel because appellate counsel failed to raise on direct appeal **(1)** Kofoed planted evidence used at Petitioner's trial and Petitioner's concerns that Kofoed lied on the stand (*id.* at

CM/ECF p. 25); **(2)** law enforcement's improper seizure and transportation of Petitioner from Iowa to Nebraska at time of his arrest (*id.* at CM/ECF p. 34); **(3)** Douglas County Sheriff Captain Dan McGovern's misconduct in discussing evidence from Petitioner's case in a class he taught at Iowa Western Community College (*id.* at CM/ECF p. 38); **(4)** trial counsel's failure to seek a mistrial or removal of Retelsdorf due to her conflict of interest (*id.* at CM/ECF pp. 41-42); (5) prosecution's use of Petitioner's invocation of his rights to remain silent and to counsel after his arrest and to testify on his own behalf in violation of the Fifth, Sixth, and Fourteenth Amendments (*id.* at CM/ECF p. 43); **(6)** Retelsdorf's misconduct in misrepresenting the DNA evidence and calling Petitioner a "rapist" and "manipulator" (*id.* at CM/ECF p. 44); **(7)** all instances of improper use of untried, uncharged "prior bad acts" evidence (*id.* at CM/ECF pp. 47-49); **(8)** prosecution's and law enforcement's failure to turn over all evidence in the case to the defense in violation of *Brady v. Maryland* (*id.* at CM/ECF p. 52); **(9)** prosecution and trial judge knowingly permitted and encouraged Hornbacher to commit perjury during his trial testimony in violation of Petitioner's rights under the Fifth, Sixth, and Fourteenth Amendments (*id.* at CM/ECF p. 54); **(10)** trial counsel's failure to object or move for a mistrial as to the following instances of prosecutorial misconduct: Retelsdorf vouching for witness Hornbacher's credibility through a leading question, Retelsdorf eliciting testimony from Jeanette Cook that was contrary to the evidence, and the prosecution misstating Petitioner's testimony, the ballistic evidence, evidence regarding injuries to Hornbacher, and improperly instructing the jury on the law during closing arguments (*id.* at CM/ECF pp. 56-57); **(11)** ineffectiveness of trial counsel in having Petitioner reveal and explain to the jury the shock belt restraint system Petitioner wore during trial (*id.* at CM/ECF p. 64); and **(12)** trial counsel's failure to request and trial court's failure to give proper jury instructions (*id.* at CM/ECF p. 71).

4

Claim Three:          Petitioner was denied the constitutional right to a fair trial, due process, and effective assistance of counsel because **(1)** the prosecution and trial counsel spoke to the media about the DNA evidence in Petitioner's case; **(2)** trial counsel failed to correct the prosecution's inaccurate statements to the media about the DNA evidence; and **(3)** appellate counsel failed to raise on direct appeal the ineffectiveness of trial counsel and prosecutorial misconduct based on their statements to the media. (*Id.* at CM/ECF pp. 50-51.)

Claim Four:           Petitioner was denied his right to due process because **(1)** Kofoed and other law enforcement engaged in improper collection, handling, storage, and fabrication of evidence used at Petitioner's trial[3] (*id.* at CM/ECF pp. 25-27); **(2)** law enforcement and prosecution committed misconduct by failing to adequately investigate Hornbacher and seek a search warrant as to Hornbacher (*id.* at CM/ECF p. 36); and **(3)** law enforcement violated Petitioner's right to remain silent and to consult with an attorney contrary to *Doyle v. Ohio*, 426 U.S. 610 (1976) (*id.* at CM/ECF p. 43).

Claim Five:           Petitioner was denied his rights against unreasonable search and seizure and to due process because law enforcement failed to obtain valid Iowa search or arrest warrants before arresting Petitioner in Iowa and transporting Petitioner and his vehicle to Omaha,

---

[3] In the preliminary review order, the court clarified that, "[t]o the extent Petitioner frames this claim as a challenge to the Nebraska Supreme Court's decision affirming the state district court's denial of an evidentiary hearing and dismissing Petitioner's motion for postconviction relief as to the allegations involving Kofoed planting evidence, such a claim is not cognizable in a federal habeas action as it is based on errors in the state postconviction proceedings." (Filing No. 10 at CM/ECF p. 6 n.2 (citing *Jenkins v. Houston*, 4:05CV3099, 2006 WL 126632 (D. Neb. Jan. 17, 2006) (errors during state postconviction review are not cognizable in a federal habeas corpus action).)

Nebraska without proper extradition or waiver of the same. (*Id.* at CM/ECF p. 34.)

Claim Six:   Petitioner was denied his constitutional rights to a fair trial and due process because: **(1)** Retelsdorf committed prosecutorial misconduct because she had a conflict of interest that she failed to disclose to the trial court and she failed to remove herself from the prosecution once the conflict was revealed (*id.* at CM/ECF pp. 41-42); **(2)** the trial court abused its discretion when it failed to remove Retelsdorf for her conflict of interest and failed to hold a hearing to determine the impact of the conflict on the proceedings (*id.* at CM/ECF p. 42); **(3)** Retelsdorf committed prosecutorial misconduct in misrepresenting the DNA evidence and calling Petitioner a "rapist" and "manipulator" and the trial court failed to give a limiting instruction to counter Retelsdorf's unprofessional behavior (*id.* at CM/ECF p. 44); **(4)** the prosecution committed misconduct by using evidence at trial of untried, uncharged "prior bad acts" alleged to have been committed by Petitioner (*id.* at CM/ECF p. 47); **(5)** the prosecution failed to turn over all evidence in the case to the defense in violation of *Brady v. Maryland* (*id.* at CM/ECF p. 52); **(6)** the prosecution and trial judge knowingly permitted and encouraged Hornbacher to commit perjury during his trial testimony (*id.* at CM/ECF p. 54); and **(7)** the prosecution committed misconduct because Retelsdorf vouched for witness Hornbacher's credibility through a leading question, Retelsdorf elicited testimony from Jeanette Cook that was contrary to the evidence, and the prosecution misstated Petitioner's testimony, the ballistic evidence, evidence regarding injuries to Hornbacher, and improperly instructed the jury on the law during closing arguments (*id.* at CM/ECF pp. 56-57).

Claim Seven:   Petitioner was denied effective assistance of counsel because trial and appellate counsel did not object, move

6

for a mistrial, nor appeal the trial court's abuse of its judicial discretion by: **(1)** acting improperly and as a third prosecutor on multiple occasions (*id.* at CM/ECF pp. 75-76); **(2)** refusing to allow Petitioner's testimony about his conversation with Hornbacher (*id.* at pp. 60, 75); **(3)** failing to hold hearings on the conflict of interest involving Petitioner's trial counsel (*id.* at CM/ECF p. 75); **(4)** "crafting the testimony of a prosecution witness—a Douglas County Sheriff whom had discovered the truck driven by the victim" (*id.*); **(5)** overruling defense counsel's request for a continuance for production of Hornbacher's clothing and shoes, to have forensics examinations completed on the items, and to have the items brought into evidence (*id.* at CM/ECF pp. 31, 75); **(6)** allowing the jury to hear "prior bad act" evidence (*id.* at CM/ECF pp. 75-76); **(7)** failing to hold the Rape Shield Law hearing in camera and refusing defense counsel's request for a continuance (*id.* at CM/ECF pp. 44-45, 76); **(8)** failing to grant a directed verdict on the issue of sexual assault (*id.* at CM/ECF pp. 75-76); **(9)** suppressing the testimony of Deputy Sellers and multiple pieces of evidence due to its misinterpretation of the Rape Shield Law (*id.* at CM/ECF pp. 45-46, 76); **(10)** failing to properly instruct the jury (*id.* at CM/ECF pp. 71, 75); **(11)** partially excluding a letter from Jeanette Cook to Petitioner (*id.* at CM/ECF p. 75); and **(12)** refusing to allow up to five defense witnesses to give relevant testimony to the jury that directly contradicted Hornbacher's testimony (*id.* at CM/ECF pp. 75-76).

Claim Eight alleges several instances of ineffective assistance of postconviction counsel. (Filing No. 1 at CM/ECF pp. 25, 68.) In its preliminary review order, the court dismissed this claim because it is not cognizable in a federal habeas corpus action. (Filing No. 10 at CM/ECF p. 9 (citing *Jenkins v. Houston*, No. 4:05CV3099, 2006 WL 126632, at *1 (D. Neb. Jan. 17, 2006) (noting that "claims based on ineffective assistance of counsel and other constitutional deprivations during state postconviction proceedings are not cognizable in a federal habeas

corpus action").) Although Claim Eight was dismissed, the court advised Respondents to "be mindful of and, if necessary, respond to Petitioner's allegations in his habeas petition that the ineffectiveness of his postconviction counsel excuses any exhaustion requirements or procedural defaults." (Filing No. 10 at CM/ECF p. 9.)

## II.  BACKGROUND

### A.  Convictions and Sentences

The court states the facts as they were recited by the Nebraska Supreme Court on direct appeal in *State v. Cook*, 667 N.W.2d 201 (Neb. 2003) (filing no. 15-1), and on interlocutory appeal from the postconviction court in *State v. Cook*, 860 N.W.2d 408 (Neb. 2015) (filing no. 15-2). *See Bucklew v. Luebbers*, 436 F.3d 1010, 1013 (8th Cir. 2006) (utilizing state court's recitation of facts on review of federal habeas petition).

### 1.  Discovery and Investigation of Crime

On the morning of April 29, 2000, two men found the body of a young woman, later identified as Amy Stahlecker, on the bank of the Elkhorn River near the intersection of West Maple Road and Highway 275 in Douglas County, Nebraska. Stahlecker's body had multiple gunshot wounds, including a shot to the back of the head that exited through the face and two shots to the face that exited through the back of the head. The men notified law enforcement officers of their discovery, and the Nebraska State Patrol began an investigation of the crime.

The body was found at a point along the river where the river was spanned by a bridge that was part of West Maple Road. At and near the bridge, West Maple Road was a four-lane concrete road with two eastbound and two westbound lanes separated by a concrete median. Investigators found a large blood smear and a trail

of blood drops on the bridge, the median, and the eastbound lanes of West Maple Road. The trail of blood drops led from the median to the north side of the bridge directly above where the body was found. Blood from the stain was later tested, and the DNA was consistent with that of Stahlecker. On the median, investigators found bullet and scalp fragments and a bracelet that had been worn by Stahlecker.

A white Ford Explorer with a blown tire was found along Highway 275 near an intersection with West Maple Road and near the location where Stahlecker's body was found. It was later discovered that the Explorer was owned by Stahlecker's friend, Angella Dowling. On Friday evening, April 28, 2000, Stahlecker left her mother's home in Fremont, Nebraska, and went to her cousin's home in Arlington, Nebraska. Stahlecker and her cousin then joined Dowling, and the three drove in the Explorer to Omaha for dinner. After dinner, they met other friends at a bar in Omaha and stayed there until about 1 a.m. on April 29. Stahlecker's cousin and Dowling decided to stay in Omaha with their respective boyfriends, and it was determined that Stahlecker would drive the Explorer to Fremont for the night and then return to Omaha the next morning to pick up the other two women. Although Stahlecker's subsequent route is unknown, she was apparently heading west on Highway 275 toward Fremont when the Explorer blew a tire near the spot where the Explorer was found that same morning.

An autopsy on Stahlecker's body revealed various abrasions and contusions in addition to the gunshot wounds to the head and face. Bruises were found on both forearms and on some fingers of the left hand. Contusions and abrasions were found on both legs, and there was a gunshot wound to the hip. The forensic pathologist who testified at trial opined that bruises on the right knuckles could have been "defensive" injuries sustained while Stahlecker was still alive. The pathologist also opined that the gunshot wound to the back of the head which exited through the face was the fatal wound and was a "distant shot" that was not fired at close range. The two shots to the face were fired at an "intermediate" range within 2 feet of the face. In the pathologist's opinion, the two shots to the face were not the fatal shots and

were the result of very rapid gun discharge or were fired at a time when Stahlecker was unconscious. The autopsy revealed that Stahlecker had a blood alcohol content of .156 when she died. The autopsy also revealed semen in the vaginal area, indicating intercourse shortly before death; however, the autopsy showed no evidence of vaginal or anal tears or bruising.

Investigators had no suspect in the killing until May 2, 2000, when a Washington County deputy sheriff was contacted by Michael Hornbacher through a mutual friend. The deputy was acquainted with Hornbacher as well as Cook, a friend of Hornbacher and the defendant in this case. Hornbacher told the deputy that Cook had confessed to killing Stahlecker. The deputy interviewed Hornbacher at his office in Omaha, and Hornbacher later went to the Nebraska State Patrol offices where he gave investigators oral and written statements. Based on the information provided by Hornbacher, investigators went to the Norwest Financial branch office in Council Bluffs, Iowa, where Cook worked. The investigators did not formally arrest Cook but told him he needed to come with them to the State Patrol offices in Omaha to be interviewed regarding the Stahlecker investigation. Investigators transported Cook to Omaha and did not allow him to drive his own vehicle, a Ford F-150 pickup truck.

Officers took Cook's truck to the State Patrol offices while Cook was being interviewed. They later returned the truck to Council Bluffs, obtained a search warrant, and brought the truck back to Nebraska State Patrol headquarters in Omaha, where the truck was searched. The search revealed blood traces on the interior of the driver's side door and floormat. Later DNA tests showed that the blood traces were consistent with Stahlecker's blood. Clothing fibers found on the passenger-side seat were consistent with the fabric of underwear worn by Stahlecker. Investigators also determined that a bloody shoeprint found on the exterior door panel of Cook's truck matched the shoeprints found at the scene of the crime.

During the interview, investigators photographed Cook's face and body. Cook's hands and forearms showed substantial scrapes and cuts. Cook's supervisor

10

at Norwest Financial later testified that she had noticed the injuries to Cook's arms and hands on Monday, May 1, 2000, and that he had told her he was injured after falling off his bicycle over the weekend.

David Kofoed, the chief crime scene investigator for Douglas County at the time, assisted with the collection of evidence in this case. In 2009, it was discovered that Kofoed had fabricated and planted evidence in at least two different murder investigations. In both cases, it was determined that Kofoed planted evidence to corroborate confessions made to police.[4]

In this case, Kofoed specifically assisted the Nebraska State Patrol by taking castings of the shoeprints found at the scene of Stahlecker's death. In addition, Kofoed, along with three other Douglas County crime scene investigators, initially processed the evidence from Cook's truck; Kofoed and another investigator were responsible for physically collecting evidence from the truck, while the other investigators were responsible for note-taking and documenting and photographing the evidence.

## 2. Cook's Arrest and Trial

Cook was arrested, and on June 12, 2000, the State filed an information charging Cook with first degree murder and use of a weapon to commit a felony. Cook pled not guilty, and a jury trial was conducted April 16 through 26, 2001.

At trial, both Hornbacher and Cook testified regarding the events of April 28 and 29, 2000. Their stories were substantially similar regarding the events of the

---

[4] *State v. Kofoed*, 817 N.W.2d 225 (Neb. 2012). *See State v. Edwards*, 821 N.W.2d 680 (Neb. 2012).

evening of April 28, but their stories differed markedly regarding the events which occurred after midnight on April 29. Cook got home from work on Friday, April 28, at about 6:15 p.m. and soon thereafter told his wife, Jeanette Cook (Jeanette), that he was going out. Cook and Hornbacher met to work out together at a gym. The two had been friends for several years. They both worked for Norwest Financial and frequently worked out together. After working out, they stopped at a sandwich shop and then went to the apartment shared by Hornbacher and his girl friend, Michelle Childs. Childs had already left the apartment to go to McCormack's sports bar to play volleyball. Cook and Hornbacher went to McCormack's to watch Childs' volleyball game. They drove in Cook's truck and arrived at McCormack's at about 8:30 p.m.

Cook and Hornbacher stayed at McCormack's after the volleyball game, socializing with various people. Both drank several beers and some shots. After some time, Childs and Hornbacher got into an argument because she was upset that he was getting drunk and that he did not want to leave when she was ready to go. Childs decided to leave and asked whether Cook could give Hornbacher a ride and whether Hornbacher could stay at Cook's apartment that night. Cook agreed and called his wife, Jeanette, at around 11:40 p.m. to let her know Hornbacher would be staying with them. Jeanette, who was angry with Cook for staying out late, did not answer the telephone and allowed the answering machine to take his message.

Hornbacher and Cook stayed at McCormack's for approximately another hour. Hornbacher's and Cook's stories diverge at the point when they left McCormack's. At trial, Hornbacher testified for the State and Cook testified in his own defense. Their differing versions of events are recounted below.

### 3. Hornbacher's Version

Hornbacher testified that he and Cook left McCormack's separately. Hornbacher saw Cook leave in Cook's truck, and Hornbacher got a ride from two women he did not know and a man he had met that night. They drove Hornbacher to his and Childs' apartment, where he let himself in and passed out in bed. Hornbacher woke up around 11 or 11:30 a.m. on Saturday, April 29, 2000. Hornbacher argued with Childs and decided to leave the apartment. Hornbacher could not find his keys, cellular telephone, and checkbook and realized he might have left them in Cook's truck the night before. Hornbacher called Cook to arrange to pick up the items he had left in Cook's truck. Cook did not want Hornbacher to come to Cook's apartment, so they arranged for Cook to pick up Hornbacher in front of Hornbacher's apartment. After getting off the telephone, Hornbacher told Childs he thought Cook was "acting pretty weird."

Cook picked up Hornbacher some time later. As they drove in the truck, Hornbacher could tell Cook was upset, and Cook indicated that he was concerned about something that would affect his family. Cook drove to Walnut Grove Park, where he parked the truck, and Cook and Hornbacher talked for what Hornbacher described as "an eternity." Hornbacher testified that Cook told him that after he left McCormack's, he had driven out west on Highway 275, where he encountered a young woman with a flat tire. Hornbacher noticed abrasions on Cook's arms but Cook would not tell Hornbacher how he got them. Hornbacher's cellular telephone rang, and he located it beneath the seat. Cook told Hornbacher that the telephone must have fallen beneath the seat when he and the woman with the flat tire had sexual intercourse in the front seat of the truck. Cook showed Hornbacher a scrap of paper tucked into the sun visor and told Hornbacher the woman had given him her name and telephone number. Cook then told Hornbacher that after the intercourse, the woman had "weirded out," and Cook thought she might try to claim that he had raped her. Cook ordered the woman to get out of the truck, and then he "lost it" and

grabbed his 9-mm handgun from the truck's console and "unloaded" it on the woman. Cook told Hornbacher he then dumped the woman's body in a ravine.

Cook drove Hornbacher back to Hornbacher's apartment and regained his composure on the way. Cook told Hornbacher he had cleaned his truck twice that morning in order to get rid of any evidence linking him to the woman's death. Cook left, and Hornbacher went into his apartment where Childs was still in bed. Hornbacher recounted to her his conversation with Cook. Hornbacher stayed at his own apartment the rest of the day.

Hornbacher and Childs heard media reports about Stahlecker's death on Sunday, April 30, 2000. Hornbacher testified that he wanted to urge Cook to confess to authorities, but Childs objected. Hornbacher did nothing until the evening of Monday, May 1, when he contacted the aforementioned mutual friend to get him into contact with the Washington County sheriff's deputy. Hornbacher spoke to the deputy on Tuesday, May 2, and told him about Cook's confession.

### 4. Cook's Version

Cook testified in his own defense. He testified that while they were at the bar, he drank two shots provided by Hornbacher. One was a shot of "GHB," a substance sometimes called the "date rape drug," which acts as a sedative, diminishing inhibitions and blotting out memory. Cook was drunk at the time Hornbacher gave him the GHB and did not take it intentionally. When he and Hornbacher left McCormack's, Cook saw Hornbacher get into a car with some other people. Cook decided to follow them in his truck because he had told Childs that Hornbacher could stay at Cook's apartment. The other people took Hornbacher to Hornbacher's apartment. Cook saw Hornbacher at his apartment door, fumbling for his keys. Cook pulled up and told Hornbacher he had left his keys in Cook's truck. Hornbacher got into Cook's truck, and the two decided to go to a bar in Fremont that featured female strippers. Cook thought the bar might still be open.

14

While driving toward Fremont on Highway 275, Cook encountered Stahlecker and the disabled Ford Explorer. Cook decided to stop to help her, despite Hornbacher's protests. Cook tried to change the tire but decided he could not because the rim was bent. He could not call for help because his cellular telephone did not work, and he could not find Hornbacher's cellular telephone, which had fallen beneath the seat. Cook decided they should look for an open service station to get help. Stahlecker got into the front seat with Cook, and Hornbacher got into the back seat, where he passed out or fell asleep. Cook drove toward Omaha on West Maple Road.

They found no open service station, and Stahlecker suggested they return to the Explorer. Neither Cook nor Stahlecker was certain where the Explorer was, and they had trouble finding it. Cook suggested that they just "chill out," since they were both drunk, and he pulled into an off-road area on West Maple Road. He and Stahlecker laughed, talked, and listened to the radio while Hornbacher was passed out or sleeping in the back seat. Cook offered to give Stahlecker a back rub, and she agreed. Cook testified that they were soon engaged in sexual foreplay and began undressing. They then engaged in what Cook described as consensual sexual intercourse in the front passenger seat.

As they were dressing, Cook told Stahlecker he would like to see her again and he gave her one of his business cards so she could give him her telephone number. She wrote "Amie" and a Fremont telephone number on the card and gave it back to him. At that time, Hornbacher spoke up from the back seat. Neither Cook nor Stahlecker had realized he was awake. Hornbacher forcefully demanded that Stahlecker perform oral sex on him. She refused, and Hornbacher began to argue with her. The argument escalated despite Cook's attempts to calm Hornbacher, and Hornbacher reached over the seat to grab Stahlecker's shoulder. She pulled away, opened the passenger-side door, and walked up to West Maple Road.

15

Cook got out of the truck, intending to either give Stahlecker her keys or offer her a ride home. He then heard two gunshots and turned to see Hornbacher leaning out of the driver's side window with Cook's gun in his hand, shooting at Stahlecker. Cook began to run toward Stahlecker. Because it was dark, he did not see the median on West Maple Road, and he ran into the median and tripped, scraping his arms and hands. Cook heard the truck accelerating behind him and saw Hornbacher drive the truck up onto West Maple Road. When Hornbacher caught up to Stahlecker, he parked the truck, jumped out of it with the gun, and followed her. Cook saw Hornbacher shoot Stahlecker in the back of the head from a distance of about 10 feet. Stahlecker collapsed. Hornbacher approached her, and when he was within 5 feet, Hornbacher shot her twice in the face.

Cook ran to Stahlecker and checked for a pulse. Finding no pulse, he realized she was dead. Cook asked Hornbacher why he had killed her. Hornbacher did not reply but instead told him to "get her off the road." Because Hornbacher still had the gun and Cook feared for his own safety, he did as Hornbacher directed. Together they dragged Stahlecker's body across the road and shoved it off the bridge. Cook saw Hornbacher pick up Stahlecker's keys, which Cook had dropped. Cook and Hornbacher got into the truck to return to Omaha. They were driving east on Dodge Street back into Omaha, and when they approached a bridge over the Elkhorn River, Hornbacher told Cook to slow down. As they were driving over the bridge, Hornbacher threw Stahlecker's keys into the river. Cook speculated that Hornbacher might also have thrown Cook's gun into the river, because Cook did not know where it was.

The two continued into Omaha and argued about what to do next. Cook testified that Hornbacher threatened that if he said anything about Stahlecker's death, Cook "would go down, too." Cook dropped Hornbacher off at Hornbacher's apartment at about 3:30 a.m. and told him they should talk after they sobered up. Hornbacher took the gun's ammunition and clip with him. On his way home, Cook stopped at a carwash where he washed blood off the seats and vacuumed the interior

of the truck. He arrived home about 4:30 a.m. He undressed and washed the scrapes on his hands and arms and applied antibiotic ointment before going to bed. Cook's wife, Jeanette, was awake, and he showed her his injuries. He told her he had been in a fight but that if anyone asked her, she should say he was injured falling off his bicycle.

Cook slept until about 7 a.m., when he awoke and began routine Saturday morning chores. He washed a load of laundry, including the clothes he had worn the night before. Cook drove to Standing Bear Lake, where he rode his bicycle on the trails. Before long, he fell off the bicycle and landed on his arms and hands. Cook returned home around 10 a.m. Jeanette was sleeping but their daughter was awake, and he gave her breakfast. Jeanette awoke around 12:30 p.m. and was angry with Cook for going out the night before. She left to go study. After Jeanette left, Hornbacher called Cook. The two decided to meet at Hornbacher's apartment, and Cook picked him up at about 1:30 p.m. At trial, Cook attempted to give testimony regarding his version of their conversation in the truck. However, the court sustained the State's hearsay objections, and Cook made no offer of proof of the testimony he would have given regarding the conversation.

### 5. Other Witnesses and Evidence

Various other witnesses testified for the State, and Cook offered other testimony and evidence in his defense. Additional evidence and testimony which relates to Cook's assignments of error on appeal will be related here.

Immediately after Hornbacher testified at trial, the State called Childs as a witness. She testified similarly to Hornbacher and Cook regarding the events of April 28, 2000. In addition, she testified that Hornbacher got home at around 12:50 a.m. and did not go out again. Childs also testified that after Hornbacher met with Cook the following day, he came home and told her that Cook had told Hornbacher that the night before, Cook had had consensual sex with a woman and thereafter shot

her. In most respects, Childs' version of Cook's statements was similar to Hornbacher's testimony.

The State also presented the testimony of Amy Hoffmeyer. Hoffmeyer worked with Childs and played volleyball with her at McCormack's on April 28, 2000. After volleyball, Hoffmeyer remained at McCormack's, socializing with various people including Hornbacher and Cook. Hoffmeyer testified that as she was putting her keys into the ignition of her car after leaving the bar, Cook knocked on the window. He told her he wanted her to come back into the bar to get to know him better. She said no, but Cook persisted with his requests, at one point reaching into the car to put his hand on her shoulder. She mentioned that she knew he was married but that he said he did not care. Cook eventually gave up, and she drove home. On cross-examination, Hoffmeyer testified that she had not felt threatened by Cook, she just thought it odd that he wanted to get to know her better considering that he was married.

Before Cook testified in his defense, a hearing was held outside the presence of the jury in which Cook's attorney said he anticipated that the State would cross-examine Cook about an incident with "a woman named Yvette" that occurred at McCormack's on the evening of April 28, 2000. In the hearing, it was stated that a woman named "Yvette Carmen" had told friends that while she was on her way to the bathroom, Cook had grabbed her, took her to the parking lot, started to kiss her, and put his hand down her pants. Cook also apparently tried to get her into his truck. Cook's attorney wanted to get any such question prohibited as improper prior bad acts evidence. The State argued the evidence was offered for the purpose of showing Cook's intent to get a woman into his truck to have sex. After much discussion, the district court stated, "The sexual acts is [sic] 403. The other, getting into the truck, I'll just rule when the time comes." *See* Neb. Rev. Stat. § 27-403 (Reissue 1995).

During cross-examination, the State asked Cook to tell about the incident where he followed Hoffmeyer outside to her car. After Cook told his side of the

18

story, the State asked about a subsequent time that evening that Cook had gone out to the parking lot. Cook said that he had gone outside to get some fresh air and that "[s]omeone did come outside with me, but I did not ask them [sic] to come outside with me." Upon further questioning, Cook stated that he did not know the person's name but that the person was female. The State asked what Cook and the female did in the parking lot, and Cook stated, "We—again, we talked, and we kissed and that was it. We were out there for less than five minutes and came back in." Throughout this questioning, Cook's attorney objected on the basis of relevance and the district court overruled the objections. Finally, the State asked, "Did you ask her to get in your truck with her [sic]?" Cook's attorney then objected, and the court sustained the objection. The State then moved on to a different line of questioning.

Jeanette testified for the State regarding, inter alia, her interaction with Cook on April 29, 2000, the day following the killing of Stahlecker. During cross-examination, Cook's attorney asked whether at about 12:30 p.m. of that day she had gone to study but had instead written a letter to Cook. She said that she had. When Cook's attorney began to question Jeanette further about the letter, the State objected on the basis of hearsay and relevance. During a side-bar conference, it was stated that the letter was never given to Cook and that instead Jeanette had given it to the defense attorney some time after Cook's arrest. The court sustained the hearsay objection but allowed Cook to make an offer of proof of the letter. In the letter, Jeanette expressed that she was angry with Cook for having been out late with Hornbacher the night before. She also expressed her ongoing dissatisfaction related to Cook's friendship with Hornbacher and recounted various incidents in which she thought Hornbacher had a negative influence on Cook, including incidents in which Cook covered for Hornbacher because he was cheating on his girl friend. Jeanette expressed her desire that Cook not allow his friendship with Hornbacher to affect his relationship with her.

Charles O'Callaghan, an investigator for the Nebraska State Patrol, testified for the State regarding the investigation of Stahlecker's killing. During cross-

examination, defense counsel asked whether O'Callaghan had executed a search warrant on Hornbacher's residence, and O'Callaghan replied that he had not. On redirect, in reference to the testimony that investigators had not searched Hornbacher's residence, the prosecutor elicited testimony that in order to get a search warrant, investigators must have probable cause that the person committed a crime. The prosecutor asked O'Callaghan, "At any point in time in this investigation, did you have probable cause that Mike Hornbacher committed any crime?" O'Callaghan replied, "No."

Michael Auten, a state patrol forensic chemist, testified for the State. Defense counsel elicited testimony from Auten that if ordered to do so, Auten could test the clothes worn by Hornbacher on the night of the killing to test for comparison to fibers found in Cook's truck and on Stahlecker's clothing. In a side-bar conference, defense counsel moved for an order for production of Hornbacher's clothing for fiber analysis. The court denied the motion, and defense counsel did not pursue the issue further.

During Hornbacher's testimony, on cross-examination, the following exchange occurred between defense counsel and Hornbacher:

[Defense counsel:] You had never known . . . Cook to be violent with a woman before, did you, sir?

[Hornbacher:] Not until after this trial started.

[Defense counsel:] And—

[Hornbacher:] I take that back. I do.

[Defense counsel:] Excuse me, sir. At the time that you gave this statement on May 10th, did you indicate that you had never seen him do that to a woman?

[Hornbacher:] I've never seen him do it to a woman, no.

20

Defense counsel then moved on to other questioning.

### 6. Motions, Verdict, and Sentencing

The State charged Cook with first degree murder under alternative theories. In the information, the State charged that Cook "did . . . purposely and with deliberate and premeditated malice, or during the perpetration of, or attempt to perpetrate a First Degree Sexual Assault, kill Amy Stahlecker." Cook was also charged with use of a weapon to commit a felony, but Cook was not separately charged with first degree sexual assault.

At the end of the State's case, Cook's attorney moved the court:

> for a dismissal of these charges against the defendant for the reason that the State has failed to meet it's [sic] prima facie case against the defendant. And my guess is you'll probably let it go to the jury on the issue of first degree murder, but I'm going to ask the Court to consider dismissing the action against the defendant on the first degree sexual assault. And then in the alternative, sir, I would ask the Judge—this Court to enter an acquittal of the defendant on those two charges, but particularly the sexual assault charge.

The district court overruled the motion. At the end of all the evidence, Cook renewed his motion and the district court again overruled it.

Cook's attorney objected to the jury instruction on the count of first degree murder, stating, "I'm going to object to this, the State being able to charge Mr. Cook with both deliberate and premeditated malice or during the perpetration of a first degree sexual assault." The district court asked, "Do you think the State should be required to elect?" When Cook's attorney replied in the affirmative, the district court overruled the objection. In instructing the jury on the charge of murder, the district court gave a step instruction, in which it instructed the jury on four types of homicide: first degree murder-felony murder, first degree murder-premeditated

21

murder, second degree murder, and manslaughter. As part of the step instruction, the district court instructed the jury to first consider whether Cook committed felony murder and, if it found that he had not, then to consider whether he committed premeditated murder.

On April 26, 2001, the jury returned verdicts finding Cook guilty of first degree murder and use of a firearm to commit a felony. The verdict form stated that the jury found Cook guilty of "Murder in the First Degree" but did not specify whether the jury found him guilty of "first degree murder-felony murder" or "first degree murder-premeditated murder." Cook, through defense counsel, filed a motion for new trial. Cook, pro se, filed additional motions for new trial. The district court overruled the motions for new trial.

A presentence investigation report was prepared prior to sentencing. The report included a probation officer's report, in which the probation officer concluded that Cook "has a very volatile temper, is a womanizer and could almost be considered a sociopath" and that Cook is "a very dangerous individual." The probation officer then asked that the district court "consider life imprisonment with an additional 50 years for the charge of Use of a Firearm to Commit a Felony." The report also contained various letters written in support of Cook.

On July 20, 2001, the court sentenced Cook to life imprisonment on the first degree murder conviction and to 49 1/2 to 50 years' imprisonment on the weapons conviction.

## B.  Direct Appeal

Cook appealed his convictions and sentences to the Nebraska Supreme Court. (Filing No. 15-1; Filing No. 15-4.) Cook was represented by different counsel on appeal than at trial. (Filing No. 15-1; Filing No. 15-4.) Cook argued that the trial court erred in (1) sustaining the State's hearsay objection and disallowing Cook's

22

testimony regarding his version of his conversation with Hornbacher on the day following Stahlecker's killing, (2) overruling Cook's motion for directed verdict on the felony murder theory of the first degree murder charge, (3) allowing evidence of prior bad acts involving Hoffmeyer and Carmen and failing to give a limiting instruction with regard to such evidence, (4) sustaining the State's hearsay objection and disallowing evidence of the contents of the letter Jeanette wrote to Cook, (5) failing to order that Cook be allowed to review the presentence investigation report prior to sentencing, (6) imposing an excessive sentence, and (7) overruling his motions for mistrial and for a new trial. (Filing No. 15-1 at CM/ECF p. 15; Filing No. 15-7.)

Cook also asserted that he was denied effective assistance of counsel and that his trial counsel was deficient in the following respects: (1) failing to object to hearsay testimony by Childs that Hornbacher told her that Cook had told him that he had killed Stahlecker; (2) failing to object to the testimony of Hoffmeyer which Cook asserted was evidence of a prior bad act; (3) eliciting testimony from Hornbacher regarding Cook's prior incidents of violence toward women; (4) failing to request a limiting instruction regarding the proper use of prior bad acts evidence involving Hoffmeyer and Carmen; (5) failing to object to O'Callaghan's testimony regarding a determination of probable cause when no proper foundation had been established for such expert testimony; (6) failing to request a continuance in order to pursue fiber evidence which might have connected Hornbacher to the crime; and (7) failing to object to portions of the presentence investigation report which Cook asserted contained unsupported conclusions of the probation officer. (Filing No. 15-1 at CM/ECF p. 15; Filing No. 15-7.)

In a published opinion dated August 1, 2003, the Nebraska Supreme Court affirmed Cook's convictions and sentences. (Filing No. 15-1.) The Nebraska Supreme Court concluded that "each of Cook's assignments of error is either without merit or not susceptible to review on direct appeal." (Filing No. 15-1 at CM/ECF p. 28.) With respect to Cook's conversation with Hornbacher, the court held that,

because Cook made no offer of proof, it could not find that Cook's testimony would have met an exception to the hearsay rule, and thus concluded the trial court did not err in sustaining the State's hearsay objection. (Filing No. 15-1 at CM/ECF pp. 16-18.) The court determined that Cook waived the right to assert prejudicial error regarding Hoffmeyer's testimony on appeal because he did not object to the testimony at trial (filing no. 15-1 at CM/ECF p. 20), and that any error in admitting the potential testimony regarding Carmen was harmless because it was cumulative of other testimony offered by Cook in his own direct examination (filing no. 15-1 at CM/ECF pp. 20-21). The court concluded that the trial court did not err in denying Cook's motion for a directed verdict on the felony murder charge because the evidence was sufficient to submit the charge to the jury (filing no. 15-1 at CM/ECF pp. 18-20), in disallowing evidence of the contents of Jeanette Cook's letter because Cook demonstrated no exception to the hearsay rule which would allow admission of the letter (filing no. 15-1 at CM/ECF pp. 21-22), and in failing to order a review of the presentence investigation report where Cook did not request the opportunity to review the report and the trial court did not deny such a request (filing no. 15-1 at CM/ECF pp. 22-23). The court rejected Cook's argument that his sentence for use of a weapon to commit a felony was excessive. (Filing No. 15-1 at CM/ECF pp. 23-24.)

The Nebraska Supreme Court did not address Cook's ineffective assistance of trial counsel claims because they were not raised or ruled upon at the trial court level and the record was insufficient to adequately review them. (Filing No. 15-1 at CM/ECF pp. 26-27.) Finally, the Nebraska Supreme Court found no merit in Cook's argument that the trial court erred in overruling his motions for mistrial and for new trial based on the "'many and varied' evidentiary errors in this case combined with the deficient performance of defense counsel." (Filing No. 15-1 at CM/ECF p. 27.) The Nebraska Supreme Court explained that, because it found no merit in Cook's other assignments of error and because the record on appeal did not allow the court to determine whether Cook received ineffective assistance of counsel, Cook failed

to establish that his trial was inherently defective. (Filing No. 15-1 at CM/ECF pp. 27-28.)

The Nebraska Supreme Court overruled Cook's motion for rehearing and issued its mandate on September 26, 2003. (Filing No. 15-4 at CM/ECF p. 3; Filing No. 15-10.)

## C.  Postconviction Action

On July 2, 2004, Cook filed a verified motion for postconviction relief. (Filing No. 16-1 at CM/ECF pp. 10-115.) The state district court appointed new counsel (Mary Gryva) to represent Cook in the postconviction matter. (Filing No. 16-2 at CM/ECF p. 152.) At Gryva's request, the state district court appointed Michael Maloney as co-counsel in the postconviction proceeding. (Filing No. 16-1 at CM/ECF p. 121.) On April 11, 2005, Cook filed a pro se amended verified motion for postconviction relief. (Filing No. 16-1 at CM/ECF pp. 122-263.) In July 2005, the state district court granted Gryva and Maloney leave to withdraw as counsel. (Filing No. 16-2 at CM/ECF pp. 6, 8.) On August 23, 2005, the state district court appointed the Douglas County Public Defender's Office to represent Cook. (Filing No. 16-2 at CM/ECF p. 9.) On September 4, 2009, Cook filed a second, and final, amended verified motion for postconviction relief. (Filing No. 16-2 at CM/ECF pp. 13-84.) The majority of the second amended postconviction motion was drafted by Cook, despite Cook having been appointed counsel.[5] (Filing No. 15-42.) This is the operative motion for the state district court orders and Cook's subsequent postconviction appeals.

---

[5]  Cook's counsel explained to the court that because Cook edited the motion prepared by counsel, counsel did not sign it. (Filing No. 15-42.)

Cook raised four of the same ineffective assistance of trial counsel claims as he did on direct appeal,[6] along with 31 new claims for postconviction relief. (Filing No. 16-2 at CM/ECF pp. 13-84.) On June 27, 2012, the state district court entered an order addressing all of Cook's claims. (Filing No. 16-2 at CM/ECF pp. 128-51.) The court granted a hearing on Cook's four claims of ineffective assistance of trial counsel that were raised on direct appeal, along with three new claims. (Filing No. 16-2 at CM/ECF pp. 134-39, 142.) The court rejected the remaining claims on the grounds that they either clearly had no merit or did not allege facts with sufficient specificity regarding prejudice. (Filing No. 16-2 at CM/ECF pp. 139-51.) Two of the rejected claims involved allegations that Kofoed fabricated evidence, and the remaining claims alleged that Cook received ineffective assistance of counsel due to his appellate counsel's failure to make certain arguments on appeal.

On July 6, 2012, Cook filed an approximately 150-page pro se motion to alter or amend the state district court's order. (Filing No. 16-2 at CM/ECF pp. 158-311.) On February 27, 2013, the state district court overruled Cook's motion to alter or amend.[7] (Filing No. 15-27 at CM/ECF p. 6.) On that same day, the state district court

_____

[6] Specifically, Cook alleged the following four ineffective assistance of trial counsel claims in his second amended postconviction motion: (1) failing to object to hearsay testimony by Childs that Hornbacher told her that Cook had told him that he had killed Stahlecker; (2) failing to object to the testimony of Hoffmeyer which Cook asserts was evidence of a prior bad act; (3) eliciting testimony from Hornbacher regarding Cook's prior incidents of violence toward women; and (4) failing to request a limiting instruction regarding the proper use of prior bad acts evidence involving Hoffmeyer and Carmen. (Filing No. 16-2 at CM/ECF pp. 13-20.)

[7] The order was delayed because Cook filed an appeal to the Nebraska Supreme Court while his motion to alter or amend was still pending in the state district court. The state district court had to wait for the mandate dismissing Cook's appeal for lack of jurisdiction (due to the pending motion to alter or amend) to rule

found that, due to a conflict of interest, the Douglas County Public Defender's Office could no longer represent Cook, and it appointed the Nebraska Commission on Public Advocacy to represent Cook. (Filing No. 15-27 at CM/ECF p. 7.) Later, on October 22, 2013, Robert Kortus and his office, the Nebraska Commission on Public Advocacy, were allowed to withdraw as Cook's counsel and the state district court appointed Gerald Soucie to represent Cook. (Filing No. 15-5 at CM/ECF p. 3.) Soucie represented Cook throughout the remainder of his postconviction proceedings in the Nebraska state courts.

Cook filed an interlocutory appeal in the Nebraska Supreme Court from the state district court's rejection of twenty-eight of his thirty-five claims for postconviction relief. (Filing No. 15-5; Filing No. 15-11; Filing No. 15-12.) Cook filed a motion for leave to file a pro se supplemental brief in addition to his counsel's brief. (Filing No. 15-13.) The Nebraska Supreme Court overruled his motion without prejudice. (Filing No. 15-5 at CM/ECF p. 1.) Cook, through Soucie, then filed a brief assigning that the state district court erred when it denied an evidentiary hearing and dismissed the motion for postconviction relief (1) on the ground that Kofoed or other investigators planted evidence used at Cook's trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and (2) on the grounds relating to the "layered" allegation of ineffectiveness of appellate counsel for failure to raise and argue issues on direct appeal involving conflict of interest, specific instances of ineffective assistance of trial counsel, and incorrect jury instructions, in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. (Filing No. 15-12 at CM/ECF p. 4; *see also* Filing No. 15-11 at CM/ECF p. 13.)

---

on the motion. (*See* Filing No. 15-14 at CM/ECF p. 20; Filing No. 15-27 at CM/ECF pp. 4-5.)

The Nebraska Supreme Court affirmed the judgment of the district court in a published opinion dated March 20, 2015. (Filing No. 15-2.) The Nebraska Supreme Court found no merit to Cook's claims that Kofoed or other investigators planted evidence used at Cook's trial. (Filing No. 15-2 at CM/ECF pp. 7-8.) With respect to Cook's layered ineffective assistance of counsel claims, the Nebraska Supreme Court noted that, although Cook made several conclusory arguments in his statement of facts regarding the sufficiency of his allegations, he provided no explanation in the argument section of his brief for how the district court actually erred in rejecting his layered claims or how the claims were factually sufficient. (Filing No. 15-2 at CM/ECF p. 8.) Instead, Cook argued that the Nebraska Supreme Court should overturn the rule that precludes review of issues which were raised on direct appeal or were known to the defendant and could have been litigated on direct appeal. (Filing No. 15-2 at CM/ECF p. 8.) The Nebraska Supreme Court thus declined to consider Cook's layered ineffective assistance of counsel claims because he failed to argue how the state district court erred in rejecting those claims and because the argument Cook actually advanced in his brief was not specifically assigned as an error on appeal, nor was it raised before the state district court. (Filing No. 15-2 at CM/ECF pp. 8-9 (citing *State v. Filholm*, 848 N.W.2d 571 (Neb. 2014).)

Soucie filed a brief in support of a motion for rehearing, and, one day later, Cook filed a pro se brief in support of a motion for rehearing. (Filing No. 15-16; Filing No. 15-17.) The Nebraska Supreme Court struck Cook's pro se brief and, on November 18, 2015, overruled the motion for rehearing. (Filing No. 15-5 at CM/ECF pp. 2, 4.)

On November 17, 2016, the state district court conducted an evidentiary hearing on Cook's seven remaining ineffective assistance of counsel claims. (Filing No. 15-28 at CM/ECF p. 13.) In an order entered May 10, 2017, the state district court rejected all his claims on the merits and denied postconviction relief. (Filing No. 15-28 at CM/ECF pp. 13-23.) Cook appealed the state district court's order to the Nebraska Supreme Court. (Filing No. 15-6.) Cook, through Soucie, filed a brief,

assigning and arguing that the state district court erred in denying his postconviction motion because his trial counsel was constitutionally ineffective for (1) failing to make an offer of proof regarding Cook's testimony about statements made by Hornbacher that was excluded as hearsay and (2) bringing to the jury's attention the fact that Cook was required to wear an electric restraining device ("shock belt") during trial. (Filing No. 15-18 at CM/ECF pp. 14, 30-47.) On October 2, 2017, Cook filed a motion for leave to file a pro se supplemental brief and two briefs in support of his motion, addressing all seven ineffective assistance of trial counsel claims denied after the evidentiary hearing. (Filing No. 15-6; Filing No. 15-19; Filing No. 15-20; Filing No. 15-21.) The Nebraska Supreme Court overruled Cook's motion to file a pro se supplemental brief. (Filing No. 15-6 at CM/ECF p. 2.)

In a memorandum opinion entered January 17, 2018, the Nebraska Supreme Court affirmed the judgment of the state district court. (Filing No. 15-3.) The Nebraska Supreme Court determined that the two ineffective assistance of trial counsel claims at issue in the appeal were procedurally barred under Nebraska law because they were not raised on direct appeal. (Filing No. 15-3 at CM/ECF pp. 7-8.) On April 12, 2018, the Nebraska Supreme Court denied Cook's motion for rehearing. (Filing No. 15-6 at CM/ECF p. 3; Filing No. 15-24; Filing No. 15-25.) The mandate issued on April 30, 2018. (Filing No. 15-6 at CM/ECF p. 3.)

**D.  Habeas Petition**

Cook timely filed his habeas Petition in this court on July 13, 2018. (Filing No. 1.) On October 22, 2018, Cook requested that the court enter a stay and abeyance of these habeas proceedings so that he could return to state court to file a successive postconviction action to ensure exhaustion of "any potentially unexhausted claims."

(Filing No. 8 at CM/ECF p. 2.) The court denied Cook's request.[8] (Filing No. 9.) In response to the Petition, Respondents filed an Answer (filing no. 22), a Brief (filing no. 23), and the relevant state court records (filing no. 15; filing no. 16). Respondents argue that the claims are either procedurally defaulted and/or without merit. Cook filed briefs in response to Respondents' Answer and Brief. (Filing No. 32; Filing No. 33.) Respondents filed a Reply Brief. This matter is now fully submitted for disposition.

## III.  OVERVIEW OF APPLICABLE LAW

Three strands of federal habeas law intertwine in this case. They are (1) exhaustion and procedural default; (2) the deference that is owed to the state courts when a federal court reviews the factual or legal conclusions set forth in an opinion of a state court; and (3) the standard for evaluating a claim of ineffective assistance of counsel. The court elaborates upon those concepts next so that it may apply them later in a summary fashion as it reviews Cook's claims.

## A.  Exhaustion and Procedural Default

As set forth in 28 U.S.C. § 2254:

_____

[8] The court reasoned that Cook's "claims are likely procedurally defaulted, not merely unexhausted," because "under Nebraska law, it is highly unlikely that [Cook] may now return to state court in order to present these claims." (Filing No. 9 at CM/ECF p. 2.) The court also stated that it would "not grant a stay of this matter based solely on [Cook's] statement that he hopes to file a subsequent postconviction action in order to exhaust claims that may or may not be exhausted already, particularly where it appears from his allegations that a return to state court would be futile." (Filing No. 9 at CM/ECF p. 2.)

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

(A) the applicant has exhausted the remedies available in the courts of the State; or

(B)(i) there is an absence of available State corrective process; or

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The United States Supreme Court has explained the habeas exhaustion requirement as follows:

> Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

*O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

A state prisoner must therefore present the substance of each federal constitutional claim to the state courts before seeking federal habeas corpus relief. In Nebraska, "one complete round" ordinarily means that each § 2254 claim must have been presented to the trial court, and then in an appeal to either the Nebraska Supreme Court directly[9] or to the Nebraska Court of Appeals, and then in a petition

---

[9] Where a life sentence has been imposed in a criminal case, the appeal goes directly to the Nebraska Supreme Court. Neb. Rev. Stat. § 24-1106 (West).

for further review to the Nebraska Supreme Court if the Court of Appeals rules against the petitioner. *See Akins v. Kenney*, 410 F.3d 451, 454-55 (8th Cir. 2005).

"In order to fairly present a federal claim to the state courts, the petitioner must have referred to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue in a claim before the state courts." *Carney v. Fabian*, 487 F.3d 1094, 1096 (8th Cir. 2007) (internal citation and quotation omitted). Although the language need not be identical, "[p]resenting a claim that is merely similar to the federal habeas claim is not sufficient to satisfy the fairly presented requirement." *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999). In contrast, "[a] claim has been fairly presented when a petitioner has properly raised the 'same factual grounds and legal theories' in the state courts which he is attempting to raise in his federal habeas petition." *Wemark v. Iowa*, 322 F.3d 1018, 1021 (8th Cir. 2003) (citation omitted).

Where "no state court remedy is available for the unexhausted claim—that is, if resort to the state courts would be futile—then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default.'" *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005) (quoting *Gray v. Netherland*, 518 U.S. 152, 162 (1996)).

To be precise, a federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Also, a credible showing of actual innocence may allow a prisoner to pursue his

constitutional claims on the merits notwithstanding the existence of a procedural bar to relief. *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). To invoke the actual innocence exception, a petitioner "must show that in light of all the evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Jennings v. United States*, 696 F.3d 759, 764-65 (8th Cir. 2012) (quoting *Schlup v. Delo*, 513 U.S. 298, 327, (1995)). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Id.* (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

## B. Nebraska Law Relevant to Procedural Default

Under Nebraska law, you don't get two bites of the postconviction apple; that is, "[a]n appellate court will not entertain a successive motion for postconviction relief unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time the movant filed the prior motion." *State v. Ortiz*, 670 N.W.2d 788, 792 (Neb. 2003). Additionally, "[a] motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal." *Hall v. State*, 646 N.W.2d 572, 579 (Neb. 2002). *See also State v. Thorpe*, 858 N.W.2d 880, 887 (Neb. 2015) ("A motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal, no matter how those issues may be phrased or rephrased."); *Filholm*, 848 N.W.2d at 576 ("*When a defendant's trial counsel is different from his or her counsel on direct appeal*, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. Otherwise, the issue will be procedurally barred.") (emphasis added).

Moreover, a person seeking postconviction relief must present his or her claim to the district court or the Nebraska appellate courts will not consider the claim on appeal. *State v. Deckard*, 722 N.W.2d 55, 63 (Neb. 2006) (denying postconviction relief in a murder case and stating: "An appellate court will not consider as an

assignment of error a question not presented to the district court for disposition through a defendant's motion for postconviction relief.") Similarly, on appeal, the appealing party must both assign the specific error and specifically argue that error in the brief. Otherwise the claim is defaulted under Nebraska law. *State v. Henry*, 875 N.W.2d 374, 407 (Neb. 2016) (stating an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court).

Note also that Nebraska has a statute of limitations for bringing postconviction actions that is similar to federal law. It reads:

> (4) A one-year period of limitation shall apply to the filing of a verified motion for postconviction relief. The one-year limitation period shall run from the later of:
>
>> (a) The date the judgment of conviction became final by the conclusion of a direct appeal or the expiration of the time for filing a direct appeal;
>>
>> (b) The date on which the factual predicate of the constitutional claim or claims alleged could have been discovered through the exercise of due diligence;
>>
>> (c) The date on which an impediment created by state action, in violation of the Constitution of the United States or the Constitution of Nebraska or any law of this state, is removed, if the prisoner was prevented from filing a verified motion by such state action;
>>
>> (d) The date on which a constitutional claim asserted was initially recognized by the Supreme Court of the United States or the Nebraska Supreme Court, if the newly recognized right has been made applicable retroactively to cases on postconviction collateral review; or
>>
>> (e) August 27, 2011.

34

Neb. Rev. Stat. § 29-3001(4) (West).

## C. Deferential Standard Under 28 U.S.C. § 2254(d)

When a state court has adjudicated a habeas petitioner's claim on the merits, there is a very limited and extremely deferential standard of review both as to the law and the facts. *See* 28 U.S.C. § 2254(d). Section 2254(d)(1) states that a federal court may grant a writ of habeas corpus if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). As explained by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362 (2000), a state court acts contrary to clearly established federal law if it applies a legal rule that contradicts the Supreme Court's prior holdings or if it reaches a different result from one of that Court's cases despite confronting indistinguishable facts. *Id.* at 405-06. Further, "it is not enough for [the court] to conclude that, in [its] independent judgment, [it] would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable." *Rousan v. Roper*, 436 F.3d 951, 956 (8th Cir. 2006).

With regard to the deference owed to factual findings of a state court's decision, section 2254(d)(2) states that a federal court may grant a writ of habeas corpus if a state court proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Additionally, a federal court must presume that a factual determination made by the state court is correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

As the Supreme Court noted, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The deference due state court decisions "preserves authority to issue the writ in cases

where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Id.*

However, this high degree of deference only applies where a claim has been adjudicated on the merits by the state court. *See Brown v. Luebbers*, 371 F.3d 458, 460 (8th Cir. 2004) ("[A]s the language of the statute makes clear, there is a condition precedent that must be satisfied before we can apply the deferential AEDPA [Antiterrorism and Effective Death Penalty Act] standard to [the petitioner's] claim. The claim must have been 'adjudicated on the merits' in state court.").

The Eighth Circuit clarified what it means for a claim to be adjudicated on the merits, finding that:

> AEDPA's requirement that a petitioner's claim be adjudicated on the merits by a state court is not an entitlement to a well-articulated or even a correct decision by a state court. Accordingly, the postconviction trial court's discussion of counsel's performance—combined with its express determination that the ineffective-assistance claim as a whole lacked merit—plainly suffices as an adjudication on the merits under AEDPA.

*Worthington v. Roper*, 631 F.3d 487, 496-97 (8th Cir. 2011) (internal quotation marks and citations omitted).

The court also determined that a federal court reviewing a habeas claim under AEDPA must "look through" the state court opinions and "apply AEDPA review to the 'last reasoned decision' of the state courts." *Id.* at 497. A district court should do "so regardless of whether the affirmance was reasoned as to some issues or was a summary denial of all claims." *Id.*

## D. The Especially Deferential *Strickland* Standard

When a petitioner asserts an ineffective assistance of counsel claim, the two-pronged standard of *Strickland v. Washington*, 466 U.S. 668 (1984), must be applied. The standard is very hard for offenders to satisfy.

*Strickland* requires that the petitioner demonstrate both that his counsel's performance was deficient, and that such deficient performance prejudiced the petitioner's defense. *Id.* at 687. The first prong of the *Strickland* test requires that the petitioner demonstrate that his attorney failed to provide reasonably effective assistance. *Id.* at 687-88. In conducting such a review, the courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

The second prong requires the petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Further, as set forth in *Strickland*, counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" in a later habeas corpus action. *Id.* at 690.

Additionally, the Supreme Court has emphasized that the deference due the state courts applies with special vigor to decisions involving ineffective assistance of counsel claims. *Knowles v. Mirzayance*, 556 U.S. 111 (2009). In *Knowles*, the Justices stressed that under the *Strickland* standard, the state courts have a great deal of "latitude" and "leeway," which presents a "substantially higher threshold" for a federal habeas petitioner to overcome. As stated in *Knowles*:

> The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold. And, because the *Strickland* standard is a general standard, a state court

has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Id.* at 123 (internal quotation marks and citations omitted).

*Strickland* applies equally to appellate counsel, and appellate counsel is entitled to the "benefit of the doubt." *Woods v. Etherton*, 136 S. Ct. 1149, 1153 (2016) (a "fairminded jurist" could have concluded that repetition of anonymous tip in state-court cocaine-possession trial did not establish that the uncontested facts it conveyed were submitted for their truth, in violation of the Confrontation Clause, or that petitioner was prejudiced by its admission into evidence, precluding federal habeas relief under AEDPA; Petitioner could not establish that Petitioner's appellate counsel was ineffective, as appellate counsel was entitled to the "benefit of the doubt"). To demonstrate prejudice on account of appellate counsel's failure to raise a claim on appeal, a petitioner must show a "reasonable probability that an appeal of [the] issue would have been successful and that the result of the appeal would thereby have been different." *Pryor v. Norris*, 103 F.3d 710, 714 (8th Cir. 1997). The petitioner must show more than that the alleged error had some conceivable effect on the outcome of the proceeding. *Id.* at 713. "'Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding.'" *Id.* (quoting *Strickland*, 466 U.S. at 693).

## IV. DISCUSSION

### A. Claim One

In Claim One, Cook asserts multiple instances of ineffective assistance of trial counsel.

Cook's trial counsel was different from his counsel on direct appeal, and therefore he was required to raise on direct appeal any issue of trial counsel's

ineffective performance which was known to him or was apparent from the record. *See Filholm*, 848 N.W.2d at 576. Cook raised seven ineffective assistance of trial counsel claims on direct appeal. (*See* Filing No. 15-1 at CM/ECF p. 15; Filing No. 15-7 at CM/ECF pp. 62-68.) Claim One, Subparts (2)-(4), (11),[10] and (22)[11] of the Petition include five of the seven claims that were raised on direct appeal.[12] The Nebraska Supreme Court concluded that the record was insufficient to review them. (Filing No. 15-1 at CM/ECF pp. 26-27.) The claims in the remaining subparts of

_____

[10] In Claim One, Subpart (11), Cook argues that trial counsel was ineffective for utilizing and failing to object or move for mistrial as to untried, uncharged "prior bad acts" evidence. (Filing No. 1 at CM/ECF pp. 47-49). On direct appeal, Cook claimed that trial counsel was ineffective for failing to object to Hoffmeyer's testimony and for eliciting testimony from Hornbacher about Cook's prior instances of violence toward women. Therefore, these are the only ineffective assistance of trial counsel claims regarding prior bad act evidence that are not procedurally defaulted for failing to raise on direct appeal. *See Filholm*, 848 N.W.2d at 576. *See also Abdullah v. Groose*, 75 F.3d 408, 412-13 (8th Cir. 1996).

[11] In Claim One, Subpart (22), Cook asserts that trial counsel was ineffective for failing to request proper jury instructions. (Filing No. 1 at CM/ECF pp. 71-74). On direct appeal, Cook argued that trial counsel was ineffective for failing to request a limiting instruction regarding the proper use of prior bad acts evidence involving Hoffmeyer and Carmen. (Filing No. 15-1 at CM/ECF p. 15.) Therefore, this is the only ineffective assistance of trial counsel claim regarding jury instructions that is not procedurally defaulted for failing to raise on direct appeal.

[12] The five claims raised on direct appeal included allegations that trial counsel was ineffective for (1) failing to object to the testimony of Hoffmeyer which Cook asserted was evidence of a prior bad act; (2) eliciting testimony from Hornbacher regarding Cook's prior incidents of violence toward women; (3) failing to request a limiting instruction regarding the proper use of prior bad acts evidence involving Hoffmeyer and Carmen; (4) failing to object to O'Callaghan's testimony regarding a determination of probable cause when no proper foundation had been established for such expert testimony; and (5) failing to request a continuance in order to pursue fiber evidence which might have connected Hornbacher to the crime. (Filing No. 15-1 at CM/ECF p. 15; Filing No. 15-7 at CM/ECF pp. 62-68.)

Claim One were not raised on direct appeal. Because these claims would have been known to Cook or would have been apparent from the record (and because Cook's trial counsel was different from his counsel on direct appeal), Cook was required to raise them on direct appeal. Thus, Claim One, Subparts (1), (5)-(10), (12)-(21), are procedurally defaulted because Cook failed to raise them on direct appeal. *See Filholm*, 848 N.W.2d at 576. *See also Abdullah v. Groose*, 75 F.3d 408, 412-13 (8th Cir. 1996).

Alternatively, Claim One, Subparts (14) and (15), are procedurally barred from review by the adequate and independent state law ground doctrine. Although Cook failed to raise these claims on direct appeal, he did raise them in his second amended postconviction motion, and the state district court granted an evidentiary hearing on the claims. (Filing No. 16-2 at CM/ECF pp. 138-39, 42.) After the evidentiary hearing, the state district court denied the claims. (Filing No. 15-28 at CM/ECF pp. 17-21, 22-23.) In his final postconviction appeal, Cook assigned these claims as error and argued them in his brief to the Nebraska Supreme Court. (Filing No. 15-18.) The Nebraska Supreme Court determined that both claims were procedurally barred under Nebraska law because they were not raised on direct appeal. (Filing No. 15-3 at CM/ECF pp. 7-8.) In light of the Nebraska Supreme Court's "plain statement" that it was rejecting these claims on an independent and adequate state procedural ground, the court is barred from reviewing these issues in this habeas proceeding. *See Clay v. Norris*, 485 F.3d 1037, 1039 (8th Cir. 2007); *Shaddy v. Clarke*, 890 F.2d 1016, 1018 (8th Cir. 1989).

The court also finds that there are alternative grounds for the procedural default of Claim One, Subparts (1), (5)-(10), (12), (13), and (16)-(21). With respect to Subpart (20), although Cook failed to raise this claim on direct appeal, he did raise it in his second amended postconviction motion, and the state district court granted an evidentiary hearing on the claim. (Filing No. 16-2 at CM/ECF p. 139.) After the evidentiary hearing, the state district court denied the claim. (Filing No. 15-28 at CM/ECF pp. 21-22.) Cook did not assign as error, argue and brief this claim in the

Nebraska Supreme Court in the final postconviction appeal. Therefore, the claim would be procedurally barred because it was not raised in the final postconviction appeal. To the extent Subparts (1), (5)-(10), (12), (13), (16)-(19), and (21), were raised in the second postconviction motion and denied without an evidentiary hearing, Cook did not assign and argue any ineffective assistance of trial counsel claims in the interlocutory postconviction appeal before the Nebraska Supreme Court. Thus, these claims would be procedurally defaulted.

With respect to the claims included in Subparts (2)-(4), (11), and (22), which Cook raised on direct appeal but the Nebraska Supreme Court declined to review because of insufficiency of the record, Cook was required to reassert these claims in his second amended postconviction motion to preserve them for federal habeas review. *See Sims v. Houston*, 562 F. Supp. 2d 1066, 1072 n.4 (D. Neb. 2008) ("If the record is not sufficient to decide the claim on direct appeal, the defendant *must* litigate the claim that his trial counsel was ineffective in a separate state post-conviction action so that a proper record can be made."); *State v. Bennett*, 591 N.W.2d 779, 782-83 (Neb. 1999) ("Although an appellate court will not address an ineffective assistance of counsel claim on direct appeal when the matter necessitates an evidentiary hearing, an appellate court's refusal to do so does not bar a later motion for postconviction relief.") (internal citation omitted)).

In his second amended postconviction motion, Cook reasserted the claims included in Claim One, Subparts (11) and (22). Specifically, Cook argued that trial counsel was ineffective for: (1) failing to object to Hoffmeyer's testimony as inadmissible evidence of a prior bad act and for eliciting Hornbacher's testimony about Cook's violence against other women; and (2) failing to request a limiting instruction regarding the proper use of prior bad acts evidence involving Carmen.

41

([Filing No. 16-2 at CM/ECF pp. 15-20](#).)[13] After an evidentiary hearing on these claims, the state district court concluded that they were without merit. ([Filing No. 15-28 at CM/ECF pp. 13-23](#).) Cook did not specifically assign and argue these errors in his final postconviction appeal before the Nebraska Supreme Court. (*See* [Filing No. 15-18](#); [Filing No. 15-3](#).) Thus, these claims are procedurally defaulted. Although it is unclear whether Cook raised the issues in Subparts (2)-(4) as distinct claims in the second postconviction motion, it is clear he never properly presented them to the Nebraska Supreme Court on postconviction appeal. Therefore, these claims are now procedurally defaulted.

## B. Claim Two

In Claim Two, Cook asserts multiple grounds of ineffective assistance of appellate counsel.

### 1. Subpart (1)

In Claim Two, Subpart (1), Cook alleges that appellate counsel was ineffective for failing to raise on direct appeal that Kofoed planted evidence used at Cook's trial and Cook's concerns that Kofoed lied on the stand. ([Filing No. 1 at CM/ECF p. 25](#).) With respect to that part of the claim regarding Kofoed planting evidence used at Cook's trial, appellate counsel could not have been ineffective for failing to raise this issue on direct appeal, because the evidence that Kofoed had

---

[13] Cook did not allege trial counsel's failure to request a limiting instruction regarding Hoffmeyer's testimony. (*See* [Filing No. 16-2 at CM/ECF pp. 15-16](#)) As such, that portion of Claim One, Subpart (22), is procedurally defaulted because Cook failed to raise it in his second amended postconviction motion. Alternatively, the claim is procedurally barred because, even assuming this claim was raised in some fashion in the second postconviction motion, it was never properly presented to the Nebraska Supreme Court on postconviction appeal.

planted evidence in other investigations was not known until after Cook's trial and direct appeal. *See State v. Edwards*, 919 N.W.2d 530 (Neb. 2018) (investigation into Kofoed for falsifying reports and fabricating evidence began in 2008); *Livers v. Schenck*, 700 F.3d 340 (8th Cir. 2012) (the FBI informed the Sheriff of Douglas County, Nebraska in 2008 that it was investigating allegations that Kofoed was tampering with evidence). Indeed, Cook acknowledges in his habeas Petition that this information had not yet been discovered at the time of the direct appeal. (Filing No. 1 at CM/ECF p. 25.) Presumably, that is why, in the interlocutory postconviction appeal, the Nebraska Supreme Court addressed the merits of Cook's claim regarding Kofoed's alleged fabrication of evidence instead of finding that the claim was procedurally barred because it was not raised on direct appeal.[14] (Filing No. 15-2 at CM/ECF pp. 7-8.) Accordingly, Cook's claim that appellate counsel was ineffective for failing to raise the issue of Kofoed planting evidence is without merit.

Cook did not raise that portion of Subpart (1) regarding Cook's "concerns that Kofoed lied on the stand" in his second amended postconviction motion, and he never properly presented this issue to the Nebraska Supreme Court on postconviction appeal. Therefore, this portion of Subpart (1) is procedurally defaulted.

### 2. Subparts (3), (7), and Portions of (10)

In his second amended postconviction motion, Cook did not raise Subpart (3), Subpart (7),[15] or the portions of Subpart (10) regarding trial counsel's failure to

---

[14] Cook raised this claim in Claim Four, Subpart (1), which the court will address below.

[15] In Claim Two, Subpart (7), Cook alleges that appellate counsel was ineffective for failing to raise on direct appeal all instances of improper use of untried, uncharged "prior bad acts" evidence. (Filing No. 1 at CM/ECF pp. 47-49.)

object or move for a mistrial when Retelsdorf elicited testimony from Jeanette Cook that was contrary to the evidence and when the prosecution misstated the ballistic evidence. Moreover, Cook never properly presented these claims to the Nebraska Supreme Court on postconviction appeal. Therefore, these claims are procedurally defaulted.

### 3. Subpart (5)

In Claim Two, Subpart (5), Cook alleges that appellate counsel was ineffective for failing to argue on direct appeal that the prosecution's use of Cook's invocation of his rights to remain silent and to counsel after his arrest and to testify on his own behalf violated the Fifth, Sixth, and Fourteenth Amendments. (Filing No. 1 at CM/ECF p. 43.)

In his second amended postconviction motion, Cook raised the underlying issue in the context of ineffective assistance of trial counsel, not ineffective assistance of appellate counsel. (*See* Filing No. 16-2 at CM/ECF pp. 29-30, 140.) Specifically, he asserted that trial counsel was ineffective for failing to move for a mistrial based on the prosecution's use of Cook's invocation of his right to remain silent. (*See* Filing No. 16-2 at CM/ECF p. 140.) Ineffective assistance of appellate counsel claims are based on different facts and law than ineffective assistance of trial counsel claims. Therefore, Cook has not "fairly presented" Claim Two, Subpart (5), to the Nebraska state courts, and the claim is now procedurally defaulted. Furthermore, even assuming Subpart (5) was raised in the second postconviction and rejected by the state district court, it was never properly presented to the Nebraska Supreme Court in the interlocutory postconviction appeal.

---

Cook acknowledges that appellate counsel did raise on direct appeal that the trial court erred in admitting the prior bad act evidence involving Hoffmeyer and Carmen. (Filing No. 1 at CM/ECF p. 49.)

### 4.  Subpart (11)

In Claim Two, Subpart (11), Cook asserts that appellate counsel was ineffective for failing to argue on direct appeal that trial counsel was ineffective for having Cook reveal and explain to the jury the shock belt restraint system he wore during trial. (Filing No. 1 at CM/ECF p. 64.)

In his second amended postconviction motion, Cook raised this claim, along with the claim that trial counsel was ineffective for having Cook show the jury his shock belt during his direct examination of Cook (*see* Claim One, Subpart (15)), and the state district court granted an evidentiary hearing "to determine whether this was trial strategy." (Filing No. 16-2 at CM/ECF p. 142.) After the evidentiary hearing, the state district court denied the claim, finding that trial counsel's performance was not deficient and that counsel's trial strategy did not prejudice Cook. (Filing No. 15-28 at CM/ECF pp. 22-23.) Cook did not raise any ineffective assistance of appellate counsel claim related to the shock belt in the final postconviction appeal before the Nebraska Supreme Court. (*See* Filing No. 15-3; Filing No. 15-18.) Therefore, Claim Two, Subpart (11), is procedurally defaulted.

### 5.  Subpart (12)

In Claim Two, Subpart (12), Cook argues that appellate counsel was ineffective for failing to raise on direct appeal trial counsel's failure to request, and the trial court's failure to give, proper jury instructions. (Filing No. 1 at CM/ECF p. 71.) According to Cook, those jury instructions include an accomplice instruction, limiting instructions involving the "prior bad act" evidence,[16] possession of a

---

[16] In his Petition, Cook acknowledges that appellate counsel did raise on direct appeal that trial counsel was ineffective for failing to request a limiting instruction regarding the proper use of prior bad acts evidence involving Hoffmeyer and Carmen. (Filing No. 1 at CM/ECF p. 49.)

weapon instruction, and mental state/sexual assault/unanimous verdict instructions. (Filing No. 1 at CM/ECF pp. 71-74.)

In his second amended postconviction motion, Cook argued that appellate counsel rendered ineffective assistance for failing to raise on direct appeal trial counsel's failure to request, and the trial court's failure to give, an accomplice instruction, a unanimous verdict instruction, and possession of a weapon instruction. (Filing No. 16-2 at CM/ECF pp. 26-27, 75, 77.) The state district court denied an evidentiary hearing on these claims. (Filing No. 16-2 at CM/ECF pp. 140, 147, 148-49.) Cook failed to properly assign and argue these claims in the interlocutory postconviction appeal before the Nebraska Supreme Court in violation of an independent and adequate state procedural rule consistently applied. Therefore, they are procedurally defaulted. Cook's ineffective assistance of appellate counsel claims regarding any additional jury instructions are procedurally defaulted because they were not raised in the second amended postconviction motion or properly presented to the Nebraska Supreme Court on postconviction appeal.

### 6. Remaining Subparts of Claim Two

The state district court denied an evidentiary hearing on the remaining subparts of Claim Two. (Filing no. 16-2 at CM/ECF pp. 128-50). These subparts are procedurally defaulted because Cook failed to properly assign and argue these claims in the interlocutory postconviction appeal before the Nebraska Supreme Court in violation of an independent and adequate state procedural rule consistently applied.

## C.  Claim Three

In Claim Three, Cook contends that he was denied the constitutional right to a fair trial, due process, and effective assistance of counsel because (1) the prosecution and trial counsel spoke to the media about the DNA evidence in Cook's case; (2) trial counsel failed to correct the prosecution's inaccurate statements to the media about the DNA evidence; and (3) appellate counsel failed to raise on direct appeal the ineffectiveness of trial counsel and prosecutorial misconduct based on their statements to the media. (Filing No. 1 at CM/ECF pp. 50-51.)

Claim Three, Subparts (1) and (2), could have been raised on direct appeal but were not, and therefore, they are procedurally defaulted. Claim Three, Subpart (3), is procedurally defaulted because Cook did not raise this claim in his second amended postconviction motion before the state district court or in his briefs on postconviction appeal to the Nebraska Supreme Court.

## D.  Claim Four

In Claim Four, Cook argues that he was denied his right to due process because (1) Kofoed and other law enforcement engaged in improper collection, handling, storage, and fabrication of evidence used at Cook's trial (filing no. 1 at CM/ECF pp. 25-33); (2) law enforcement and prosecution committed misconduct by failing to adequately investigate Hornbacher and seek a search warrant as to Hornbacher (filing no. 1 at CM/ECF p. 36); and (3) law enforcement violated Cook's right to remain silent and to consult with an attorney, contrary to *Doyle v. Ohio*, 426 U.S. 610 (1976) (filing no. 1 at CM/ECF p. 43).

Subparts (2) and (3) could have been raised on direct appeal but were not, and therefore, they are procedurally defaulted. Subpart (1) was presented in one complete round in Nebraska's state courts. In rejecting the claim in the interlocutory postconviction appeal, the Nebraska Supreme Court wrote:

*Fabricated Evidence Claims.*

Cook seeks an evidentiary hearing to prove that Kofoed fabricated DNA evidence found in Cook's truck. If Kofoed did indeed fabricate evidence, that would constitute a violation of Cook's right to due process. A due process violation occurs when a law enforcement officer who participated in the investigation or preparation of the prosecution's case fabricates evidence or gives false testimony against the defendant at trial on an issue material to guilt or innocence.

In his motion for postconviction relief, Cook makes allegations that Kofoed or unnamed Nebraska State Patrol investigators either cross-contaminated evidence from the crime scene into the truck or actually planted evidence in the truck. Cook alleges that blood traces, later determined to match Stahlecker's DNA, and a fiber from Stahlecker's underwear were somehow placed in Cook's truck by the investigators. He also alleges in his motion, without any factual support, that Kofoed purchased a pair of shoes to create a bloody footprint in the truck that matched a footprint found at the scene of the crime.

An evidentiary hearing is not required when a motion for postconviction relief alleges only conclusions of fact or law. We agree with the district court that the claim of fabricated evidence is "only an allegation involving a conclusion without any supporting facts." As the district court also noted, all of the evidence found inside Cook's truck is easily explainable by Cook's own version of the events. Cook admitted that Stahlecker was inside his truck shortly before her death and that he had sexual intercourse with Stahlecker. This would explain the fiber from Stahlecker's underwear that was found in the truck. Cook also testified that he checked Stahlecker's pulse after she was shot and that he was forced to help move Stahlecker's body across the road and dump it over the bridge. This places Cook near the body and would explain the bloody footprint found on the outside of the truck, along with the traces of blood in the truck's interior.

In *State v. Edwards*, a case involving a Kofoed investigation, we stated that the allegations "would be too conclusory if [the defendant] had simply alleged in a vacuum that a law enforcement officer fabricated evidence to be used against him at trial without any factual allegations

48

upon which to base such a claim." But we determined in that case that the defendant's claims warranted an evidentiary hearing when the allegations made by the defendant were similar to Kofoed's unlawful conduct in two prior investigations:

> [The defendant] alleged that as in the 2006 investigation of the . . . murders, Kofoed found blood in an obscure part of [the defendant's] car after other [crime scene] investigators had examined the car and failed to find this evidence. The facts alleged in [the defendant's] petition also appear similar to the 2003 investigation in that Kofoed allegedly submitted swabs of evidence for DNA testing instead of submitting the evidence itself. And the allegations suggest that Kofoed may have held physical evidence for several days before having another investigator test it, a pattern that is similar to his conduct during the 2006 investigation in which he fabricated evidence.

In this case, Kofoed and his team discovered all of the evidence during the initial search of the truck. The blood was found on the floor mat of Cook's truck and also on the inside and outside door panels of the driver's-side door, all areas of the truck which could not be classified as "obscure." Additionally, Kofoed had no involvement with the investigation after he and his team completed the initial search of the vehicle. Simply alleging Kofoed's involvement in the investigation and his history of fabricating evidence is not sufficient on its own to support a claim for postconviction relief. Without more, there is no basis to conclude, based on the record in this case, that Kofoed or any other investigator placed this evidence in Cook's truck, through either cross-contamination or fabrication. The district court did not err in dismissing these claims. Cook's assignment of error is without merit.

(Filing No. 15-2 at CM/ECF pp. 7-8 (footnotes omitted).)

It is well established that "a conviction obtained through use of false evidence, known to be such by representatives of the State," violates the defendant's right to due process under the Fourteenth Amendment. *Napue v. Illinois*, 360 U.S. 264, 269

(1959). *See also Livers*, 700 F.3d at 351 (manufacturing false evidence may shock the conscience and can violate the Fourteenth Amendment's due process clause); *Winslow v. Smith*, 696 F.3d 716, 735 (8th Cir. 2012) (the use of false evidence to obtain a conviction violates due process).

Applying AEDPA's extremely stringent standard to Claim Four, Subpart (1), the court concludes that the Nebraska Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1). The court also finds that the Nebraska Supreme Court's decision was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. As the Nebraska Supreme Court determined, Cook's own testimony explains the fiber and blood evidence. Specifically, Cook admitted that Stahlecker was inside his truck shortly before her death and that he had sexual intercourse with Stahlecker, which would explain the fiber from Stahlecker's underwear that was found in the truck. Cook also testified that he checked Stahlecker's pulse after she was shot and that he was forced to help move Stahlecker's body across the road and dump it over the bridge. This established that Cook was near the body and would explain the bloody footprint found on the truck's exterior and the traces of blood found in the truck's interior. The Nebraska Supreme Court also noted the distinctions between Kofoed's conduct in Cook's case and Kofoed's unlawful conduct in prior investigations. Cook has failed to rebut the factual determinations made by the Nebraska Supreme Court by clear and convincing evidence. Giving the deference that is due the Nebraska Supreme Court, the court concludes there is no basis to grant habeas relief on Claim Four, Subpart (1).

**E.  Claim Five**

In Claim Five, Cook argues that he was denied his rights against unreasonable search and seizure and to due process because law enforcement failed to obtain valid Iowa search or arrest warrants before arresting him in Iowa and transporting him and his vehicle to Omaha, Nebraska without proper extradition or waiver of the same. (Filing No. 1 at CM/ECF p. 34.)

The Supreme Court has held that Fourth Amendment claims are not cognizable in a federal habeas action unless the petitioner did not receive a full and fair opportunity to litigate the Fourth Amendment claim in the state courts. *Stone v. Powell*, 428 U.S. 465, 494 (1976); *see also Willett v. Lockhart*, 37 F.3d 1265, 1273 (8th Cir. 1994). Because the record shows that the Nebraska courts provided Cook with a full and fair hearing on the matter (filing no. 15-26 at CM/ECF pp. 22-23, 47-49, 75-76; filing no. 15-29 at CM/ECF pp. 46-94, 229-244),[17] and there is absolutely no evidence to establish or reason to believe that there was an unconscionable breakdown in the state-court mechanism for considering Cook's Fourth Amendment claim, this part of Claim Five is not cognizable. Alternatively, his Fourth Amendment claim is procedurally defaulted because he could have raised it on direct appeal but did not. Likewise, Cook's due process claim is procedurally defaulted because he could have raised it on direct appeal but did not.

-------------------

[17] Cook litigated the validity of his arrest and the search of his truck in the state district court during a hearing on his motion to suppress and motion to quash. (Filing No. 15-26 at CM/ECF pp. 22-23, 47-49, 75-76; Filing No. 15-29 at CM/ECF pp. 46-94, 229-244). Although Cook did not raise this claim on direct appeal, he had the opportunity to do so, which satisfies the requirements of *Stone v. Powell*, 428 U.S. 465, 494 (1976).

## F.  Claim Six

In Claim Six, Cook alleges multiple instances in which he was denied his constitutional rights to a fair trial and due process. Cook did not raise any of these claims in his direct appeal. As such, Cook's grounds for relief in Claim Six are procedurally barred in federal court.

## G.  Claim Seven

Claim Seven consists of multiple ineffective assistance of trial and appellate counsel claims related to trial court error.

### 1.  Subpart (1)

In Subpart (1), Cook argues that he was denied effective assistance of counsel because trial and appellate counsel did not object, move for a mistrial, nor appeal the trial court's abuse of its judicial discretion by acting improperly and as a third prosecutor on multiple occasions. (Filing No. 1 at CM/ECF pp. 75-76.)

The ineffective assistance of trial counsel claim is procedurally defaulted because Cook did not raise the claim on direct appeal. Alternatively, the claim is procedurally defaulted because, although Cook raised it in his second amended postconviction motion and the district court denied it without an evidentiary hearing (filing no. 16-2 at CM/ECF p. 150), Cook failed to assign and argue it in the interlocutory postconviction appeal before the Nebraska Supreme Court.

The ineffective assistance of appellate counsel claim is procedurally defaulted because Cook did not raise it in his second amended postconviction motion. Moreover, even assuming the claim was asserted in the second amended postconviction motion and denied without an evidentiary hearing, Cook failed to properly assign and argue this claim in his brief in the interlocutory postconviction

appeal before the Nebraska Supreme Court. Because the claim was not properly presented under state law in violation of an independent and adequate state procedural rule consistently applied, it is procedurally defaulted.

## 2. Subpart (2)

In Claim Seven, Subpart (2), Cook argues that he was denied effective assistance of counsel because trial and appellate counsel did not object, move for a mistrial, nor appeal the trial court's abuse of its judicial discretion by refusing to allow Cook's testimony about his conversation with Hornbacher concerning Stahlecker's murder. (Filing No. 1 at CM/ECF pp. 60, 75.)

Appellate counsel did raise this trial court error on direct appeal. The Nebraska Supreme Court rejected the claim, stating that "[b]ecause Cook made no offer of proof," it could not "find that his testimony would have met an exception to the hearsay rule." (Filing No. 15-1 at CM/ECF p. 16.) As such, Cook's appellate counsel claim is an inaccurate statement about what occurred on direct appeal, and thus is without merit.

In his second amended postconviction motion, Cook argued that trial counsel was ineffective for failing to make an offer of proof after the trial court refused to allow testimony from Cook about an alleged conversation he had with Hornbacher the day following the murder. (Filing No. 16-2 at CM/ECF pp. 20-23.) The state district court granted an evidentiary hearing on the issue. (Filing No. 16-2 at CM/ECF pp. 138-39.) After the evidentiary hearing, the state district court denied the claim. (Filing No. 15-28 at CM/ECF pp. 17-21.) Cook appealed the issue to the Nebraska Supreme Court in the final postconviction appeal, and the Nebraska Supreme Court concluded that the claim was procedurally barred under Nebraska law because it was not raised on direct appeal. (Filing No. 15-3 at CM/ECF pp. 7-8.) Because the Nebraska Supreme Court plainly stated that it would not consider Cook's ineffective assistance of trial counsel claim based on an independent and

53

adequate state law ground, the court is prohibited from reviewing the issue in this habeas proceeding. *See Clay*, 485 F.3d at 1039.

### 3. Subpart (3)

In Claim Seven, Subpart (3), Cook argues that he was denied effective assistance of counsel because trial and appellate counsel did not object, move for a mistrial, nor appeal the trial court's abuse of its judicial discretion by failing to hold hearings on the conflict of interest involving Cook's trial counsel. (Filing No. 1 at CM/ECF p. 75.)

The ineffective assistance of trial counsel claim is procedurally defaulted because Cook did not raise it on direct appeal. Alternatively, the claim is procedurally defaulted because, to the extent the claim was raised in the second amended postconviction motion and rejected without an evidentiary hearing (filing no. 16-2 at CM/ECF pp. 32-37), Cook did not assign and argue this claim in the interlocutory postconviction appeal before the Nebraska Supreme Court.

To the extent that Cook raised the ineffective assistance of appellate counsel claim in his second amended postconviction motion and that it was denied without an evidentiary hearing (*see* filing no. 16-2 at CM/ECF pp. 32-37, 141-41), Cook failed to properly assign and argue this claim in his brief in the interlocutory postconviction appeal before the Nebraska Supreme Court. Because the claim was not properly presented under state law in violation of an independent and adequate state procedural rule consistently applied, it is procedurally defaulted.

### 4. Subpart (4)

In Claim Seven, Subpart (4), Cook argues that he was denied effective assistance of counsel because trial and appellate counsel did not object, move for a mistrial, nor appeal the trial court's abuse of its judicial discretion by "crafting the

54

testimony of a prosecution witness—a Douglas County Sheriff whom had discovered the truck driven by the victim" the night she died. (Filing No. 1 at CM/ECF p. 75.)

Cook did not raise this ineffective assistance of trial counsel claim on direct appeal, and therefore the claim is procedurally defaulted. The ineffective assistance of appellate counsel claim is also procedurally defaulted because it was not raised in the second amended postconviction motion in the district court, and, alternatively, even if it were raised in the district court, it was never presented to the Nebraska Supreme Court on postconviction appeal.

Notwithstanding the procedural default of both claims, the court finds that Cook's allegation regarding the trial court "crafting" the deputy's testimony to be inaccurate. The record reflects that, before the deputy was called to testify, the trial court granted the prosecutor's oral motion in limine to exclude testimony about certain items found in Stahlecker's purse. (Filing No. 15-32 at CM/ECF pp. 101-105.) When Cook's trial counsel asked the deputy during cross-examination to "give an idea of some of the personal items" found in Stahlecker's purse, the prosecutor objected based on the motion in limine order, and the trial court sustained the objection and instructed the deputy that he could not testify about certain items he found in Stahlecker's purse. (Filing No. 15-32 at CM/ECF p. 143.) Cook's ineffective assistance of counsel claims are based on a mischaracterization of the record and are without merit.

### 5. Subpart (5)

In Claim Seven, Subpart (5), Cook argues that he was denied effective assistance of counsel because trial and appellate counsel did not object, move for a mistrial, nor appeal the trial court's abuse of its judicial discretion by overruling defense counsel's request for a continuance for production of Hornbacher's clothing

and shoes, to have forensics examinations completed on the items, and to have the items brought into evidence. (Filing No. 1 at CM/ECF pp. 31, 75.)

As Respondents point out, trial counsel did not request a continuance for production of Hornbacher's clothing and shoes. (Filing No. 23 at CM/ECF p. 29.) Rather, trial counsel requested that the trial court authorize the State to locate Hornbacher's clothes from the night of Stahlecker's murder for Michael Auten, a chemist from the Nebraska State Patrol Crime Lab, to compare them to the trace evidence from Cook's truck. (Filing No. 15-34 at CM/ECF pp. 72-73.) The trial court denied the request. (Filing No. 15-34 at CM/ECF p. 73.) In light of the trial court record, Respondents construe Cook's allegation to be that the trial court abused its discretion by denying trial counsel's request for authorization. (Filing No. 23 at CM/ECF p. 29.) The court agrees with this interpretation of Cook's habeas claim.

On direct appeal, Cook raised the claim that trial counsel was ineffective for failing to request a continuance in order to pursue fiber evidence which might have connected Hornbacher to the crime. (Filing No. 15-1 at CM/ECF p. 15.) This claim is different than the claim asserted here—that trial counsel was ineffective for failing to object or move for a mistrial after the trial court denied his request for authorization. Because the ineffective assistance of trial counsel claim asserted in Subpart (5) was not raised on direct appeal, it is procedurally defaulted. Alternatively, the claim is procedurally defaulted because, even assuming it is the same claim that was asserted on direct appeal and again in the second amended postconviction motion and denied without an evidentiary hearing (see filing no. 16-2 at CM/ECF pp. 68, 145), Cook failed to assign and argue this claim in his brief in the interlocutory postconviction appeal before the Nebraska Supreme Court.

To the extent Cook alleged in his second amended postconviction motion that appellate counsel was ineffective for failing to raise on direct appeal that the trial court abused its discretion in denying his request for authorization (see filing no. 16-2 at CM/ECF p. 68), the claim is procedurally barred because he failed to assign and

argue it in the interlocutory postconviction appeal before the Nebraska Supreme Court.

### 6. Subpart (6)

In Claim Seven, Subpart (6), Cook argues that he was denied effective assistance of counsel because trial and appellate counsel did not object, move for a mistrial, nor appeal the trial court's abuse of its judicial discretion by allowing the jury to hear "prior bad act" evidence. (Filing No. 1 at CM/ECF pp. 75-76.)

The ineffective assistance of trial counsel claim is procedurally defaulted because, depending on the specific prior bad act evidence, Cook either did not raise it on direct appeal (*see* filing no. 15-1) or did not specifically assign and argue it in his final postconviction appeal before the Nebraska Supreme Court (*see* filing no. 15-18).[18]

Cook's ineffective assistance of appellate counsel claim related to the prior bad act evidence[19] is also procedurally defaulted because he did not raise the claim in the second amended postconviction motion. Moreover, even assuming the claim was raised in the second amended postconviction motion and denied without an evidentiary hearing, it was not properly assigned as error and argued and briefed in the interlocutory postconviction appeal before the Nebraska Supreme Court. Therefore, the claim is procedurally defaulted because it was not properly presented under state law in violation of an independent and adequate state procedural rule consistently applied.

---

[18] *See also* Claim One, Subpart (11), *supra.*

[19] *See* footnote 15, *supra.*

### 7. Subpart (7)

In Claim Seven, Subpart (7), Cook argues that he was denied effective assistance of counsel because trial and appellate counsel did not object, move for a mistrial, nor appeal the trial court's abuse of its judicial discretion by failing to hold the Rape Shield Law hearing in camera and refusing defense counsel's request for a continuance. (Filing No. 1 at CM/ECF pp. 44-45, 76.)

Cook did not raise the ineffective assistance of trial counsel claim on direct appeal. Therefore, the claim is procedurally defaulted. Alternatively, the claim is procedurally defaulted because, to the extent it was raised in the second amended postconviction motion and rejected without an evidentiary hearing (see filing no. 16-2 at CM/ECF pp. 78-79, 149), it was not properly assigned as error and argued and briefed in the interlocutory postconviction appeal before the Nebraska Supreme Court.

Cook raised a layered ineffective assistance of counsel claim on this issue in his second amended postconviction motion,[20] but he did not allege ineffective assistance of appellate counsel regarding trial court error on this issue. (Filing No. 16-2 at CM/ECF pp. 78-79.) Therefore, this claim is procedurally defaulted. Alternatively, this claim is procedurally defaulted because, even assuming the same ineffective assistance of appellate counsel claim was raised in the second amended postconviction motion and denied without an evidentiary hearing, it was not properly

---

[20] The court is prohibited from reviewing any layered ineffective assistance of counsel claim regarding the Rape Shield hearing because the Nebraska Supreme Court refused to consider any of Cook's layered ineffective assistance of counsel claims in the interlocutory postconviction appeal based on an adequate and independent state law ground (filing no. 15-2 at CM/ECF p. 8). See Clay, 485 F.3d at 1039.

assigned as error and argued and briefed in the interlocutory postconviction appeal before the Nebraska Supreme Court.

### 8. Subpart (8)

In Claim Seven, Subpart (8), Cook argues that he was denied effective assistance of counsel because trial and appellate counsel did not object, move for a mistrial, nor appeal the trial court's abuse of its judicial discretion by failing to grant a directed verdict on the issue of sexual assault. (Filing No. 1 at CM/ECF pp. 75-76.)

Cook's claims seem to ignore or mischaracterize what occurred during the trial and appellate proceedings. During trial, at the end of the State's case, Cook's counsel moved the court for dismissal of "the action against the defendant on the first degree sexual assault," which was not a separate charge but, instead, the underlying felony for the first degree murder charge under the alternative felony murder theory. (Filing No. 15-35 at CM/ECF pp. 142-43.) The trial court overruled the motion. (Filing No. 15-35 at CM/ECF p. 143.) At the end of all the evidence, Cook renewed his motion and the trial court again overruled it. (Filing No. 15-36 at CM/ECF p. 83.) On direct appeal, appellate counsel argued that the trial court erred when it denied trial counsel's motion for a directed verdict. (Filing No. 15-1 at CM/ECF pp. 18-20.) The Nebraska Supreme Court rejected the claim on the merits. As trial and appellate counsel did in fact raise the issue that Cook claims they did not, Cook's ineffective assistance of counsel claims are without merit. Furthermore, because Cook was not separately charged with first degree sexual assault, trial counsel was not ineffective for failing to move for a directed verdict on a non-existent charge, and appellate counsel was not ineffective for failing to raise this meritless issue on direct appeal.

In his Petition, Cook did not assert an independent constitutional claim based on the trial court's denial of his motion for a directed verdict. Nonetheless, in his

response to Respondents' Answer, Cook appears to be challenging the Nebraska state courts' rulings on this issue. (*See* Filing No. 32 at CM/ECF pp. 45-46.) Out of an abundance of caution, the court will address whether the Nebraska Supreme Court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, or involved an unreasonable determination of the facts in light of the evidence.

In its opinion on direct appeal, the Nebraska Supreme Court wrote:

For his second assignment of error, Cook asserts that the district court erred in denying his motion for a directed verdict on a portion of the State's charges against him. In particular, Cook argues that the evidence with respect to sexual assault as a predicate for felony murder was not sufficient to establish that sexual penetration was without consent. We conclude that the evidence was sufficient to submit the charges to the jury and that therefore, the district court did not err in overruling Cook's motion for directed verdict.

Cook argues that the district court should have directed a verdict on the felony murder theory of first degree murder because the State failed to put on evidence that Cook's sexual intercourse with Stahlecker was without consent. The State argues that there was sufficient evidence to support submitting an instruction on felony murder based on sexual assault to the jury and notes evidence that Cook had numerous scrapes on his arms and hands and that in addition to the gunshot wounds, Stahlecker had numerous injuries, some defensive, on her hands, arms, legs, and toes. The State also notes that Cook gave differing stories as to how he received his wounds. He told Jeanette that he sustained the injuries in a fight but told her to tell others that he sustained the injuries in a fall from his mountain bike. Further, Cook testified at trial that he sustained the injuries when he tripped over a median on Highway 275 while fleeing from Hornbacher. The State argues that the wounds to both Cook and Stahlecker and Cook's attempts to cover up the cause of his injuries could lead a jury to infer that there was a struggle between Cook and Stahlecker and a sexual assault.

In a criminal case, a court can direct a verdict only when there is a complete failure of evidence to establish an essential element of the crime charged or the evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained. *State v. Segura*, 265 Neb. 903, 660 N.W.2d 512 (2003). If there is any evidence which will sustain a finding for the party against whom a motion for directed verdict is made, the case may not be decided as a matter of law, and a verdict may not be directed. *Id.*

We conclude that the evidence in the present case was sufficient to prevent a directed verdict on the felony murder charge. The evidence noted by the State with respect to the element that sexual penetration be without consent was sufficient to support a jury finding that sexual intercourse was without consent and was instead a product of sexual assault, thus precluding a directed verdict. The jury could reasonably infer that the injuries indicated that the sexual intercourse between Cook and Stahlecker was without Stahlecker's consent. There was not a complete failure of evidence to establish the underlying felony of sexual assault as an element of felony murder, and the jury could reasonably have found Cook guilty of first degree murder under a felony murder theory. The district court therefore did not err in rejecting Cook's motion for directed verdict, and we reject Cook's second assignment of error.

(Filing No. 15-1 at CM/ECF pp. 18-20.)

In this case there was more than sufficient evidence to deny a motion for a directed verdict and submit the question to the jury. As the United States Supreme Court stated in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), the governing standard for this claim is "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." That standard was met by the Nebraska Supreme Court in this case. Its decision was not contrary to, and did not involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; nor was its decision based

on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

### 9. Subpart (9)

In Claim Seven, Subpart (9), Cook argues that he was denied effective assistance of counsel because trial and appellate counsel did not object, move for a mistrial, nor appeal the trial court's abuse of its judicial discretion by suppressing the testimony of Deputy Sellers and multiple pieces of evidence due to its misinterpretation of the Rape Shield Law. (Filing No. 1 at CM/ECF pp. 45-46, 76.)

Cook did not raise the ineffective assistance of trial counsel claim on direct appeal, and therefore this claim is procedurally defaulted.

Cook did raise the ineffective assistance of appellate counsel claim in his second amended postconviction motion (filing no. 16-2 at CM/ECF pp. 27-28), and the state district court denied the claim without an evidentiary hearing ((filing no. 16-2 at CM/ECF p. 140). Cook failed to properly assign and argue this claim in the interlocutory postconviction appeal before the Nebraska Supreme Court. Therefore, this claim is procedurally defaulted because it was not properly presented under state law in violation of an independent and adequate state procedural rule consistently applied.

### 10. Subpart (10)

In Claim Seven, Subpart (10), Cook argues that he was denied effective assistance of counsel because trial and appellate counsel did not object, move for a mistrial, nor appeal the trial court's abuse of its judicial discretion by failing to properly instruct the jury. (Filing No. 1 at CM/ECF pp. 71, 75.)

As previously set forth in Claim One, Subpart (22), the ineffective assistance of trial counsel claim is procedurally defaulted because, depending on the specific jury instruction, Cook either did not raise it on direct appeal (*see* filing no. 15-1), in his second amended postconviction motion, or in his final postconviction appeal before the Nebraska Supreme Court (*see* filing no. 15-18).

As previously set forth in Claim Two, Subpart (12), the ineffective assistance of appellate counsel claim is procedurally defaulted because, depending on the specific jury instruction, Cook either did not raise the claim in his second amended postconviction motion or did not properly assign and argue the claim in the interlocutory postconviction appeal before the Nebraska Supreme Court in violation of an independent and adequate state procedural rule consistently applied

## 11. Subpart (11)

In Claim Seven, Subpart (11), Cook argues that he was denied effective assistance of counsel because trial and appellate counsel did not object, move for a mistrial, nor appeal the trial court's abuse of its judicial discretion by partially excluding a letter from Jeanette Cook to Cook. (Filing No. 1 at CM/ECF p. 75.)

Trial counsel attempted to introduce the contents of Jeanette's letter into evidence at trial, but the trial court sustained the State's objection to the letter on the grounds of hearsay and irrelevance. (Filing No. 15-33 at CM/ECF pp. 174-76, 185; Filing No. 15-41 at CM/ECF p. 101.) On direct appeal, appellate counsel argued that the trial court erred in excluding the letter, but the Nebraska Supreme Court rejected the claim on the merits. (Filing No. 15-1 at CM/ECF pp. 21-22.) Cook's ineffective assistance of counsel claims seem to ignore or mischaracterize what occurred during the trial and appellate proceedings. Because trial and appellate counsel did in fact raise the issue that Cook claims they did not, Cook's ineffective assistance of counsel claims are without merit.

In his Petition, Cook did not assert an independent constitutional claim based on the trial court's exclusion of Jeanette Cook's letter. Nonetheless, in his response to Respondents' Answer, Cook argues that he "was entitled to explore this evidence under his right to due process and right to present a defense [under] the 5th, 6th and 14th Amendments of the U.S. Constitution." (*See* Filing No. 32 at CM/ECF pp. 49-50.) Cook did not raise at trial or on direct appeal any independent federal constitutional claim with respect to Jeanette Cook's letter.[21] Rather, Cook raised the issue under state law hearsay and relevancy grounds. The Nebraska Supreme Court resolved the claim as follows:

> As his fourth assignment of error, Cook asserts that the district court erred in disallowing evidence of the contents of the letter written to Cook by Jeanette. We conclude that Cook has demonstrated no exception to the hearsay rule which would allow admission of the letter.
>
> Cook argues it was error to refuse to admit the letter into evidence because the letter was relevant to assess Jeanette's credibility and it gave evidence of Cook's relationship and history with Hornbacher which would explain Cook's actions in covering up for Hornbacher after Hornbacher allegedly killed Stahlecker. Cook argues that the letter was not hearsay because it was not offered to prove the truth of the matters asserted but to prove that the statements were made.
>
> We agree with the State's argument that the letter was hearsay and that Cook has demonstrated no exception to the hearsay rule that would allow its introduction into evidence. "Hearsay" is defined in § 27-801(3) as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," and Neb. Rev. Stat. § 27-802 (Reissue 1995) provides that hearsay is not admissible except as provided by other rules. Although Cook argues the letter was not hearsay, the only

---

[21] Such federal claim is arguably procedurally defaulted because it was not "fairly presented" to the Nebraska state courts. *See Wemark v. Iowa*, 322 F.3d 1018, 1021 (8th Cir. 2003).

apparent purpose for admitting the letter as evidence was to prove the truth of the matters asserted regarding the nature and history of Cook's friendship with Hornbacher. There was no apparent purpose in proving the mere fact that Jeanette was the author of the letter, particularly considering that the letter was never given to Cook and therefore could not have affected his actions. Further, the letter does not appear relevant to assessing Jeanette's credibility because Cook has demonstrated no inconsistency between statements she made in the letter and statements she made at trial. We therefore conclude the district court did not err in sustaining the State's objection to the letter, and we reject Cook's fourth assignment of error.

(Filing No. 15-1 at CM/ECF pp. 21-22.)

The Nebraska Supreme Court's resolution of Cook's claim was not based on an unreasonable determination of the facts in light of the evidence or an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1) and (2). *See Ellis v. Norris*, 232 F.3d 619, 622 (8th Cir. 2000) (federal habeas court must defer to state court's interpretation of state law), *cert. denied*, 532 U.S. 935 (2001); *Richardson v. Bowersox*, 188 F.3d 973, 979-81 (8th Cir. 1999) (state court's "holding on a matter of state evidentiary law is not grounds for federal habeas relief unless it was so unfair as to constitute a denial of due process"), *cert. denied*, 529 U.S. 1113 (2000). Accordingly, Cook is entitled to no relief based on the claims he presented to the Nebraska Supreme Court.

## 12. Subpart (12)

In Claim Seven, Subpart (12), Cook argues that he was denied effective assistance of counsel because trial and appellate counsel did not object, move for a mistrial, nor appeal the trial court's abuse of its judicial discretion by refusing to allow up to five defense witnesses to give relevant testimony to the jury that directly contradicted Hornbacher's testimony. (Filing No. 1 at CM/ECF pp. 75-76.)

Cook did not raise the ineffective assistance of trial counsel claim on direct appeal, and therefore this claim is procedurally defaulted. Alternatively, the claim is procedurally defaulted because, to the extent Cook raised it in his second amended postconviction motion and it was denied without an evidentiary hearing (filing no. 16-2 at CM/ECF pp. 56-60, 145), he failed to properly assign and argue it in the interlocutory postconviction appeal before the Nebraska Supreme Court.

Cook raised the ineffective assistance of appellate counsel claim in his second amended postconviction motion. (Filing No. 16-2 at CM/ECF pp. 56-60.) However, Cook failed to properly assign and argue this claim in the interlocutory postconviction appeal before the Nebraska Supreme Court. Therefore, this claim is procedurally defaulted because it was not properly presented under state law in violation of an independent and adequate state procedural rule consistently applied.

## H.  Motion to Alter or Amend

Cook asserts that his claims are not procedurally defaulted because most of the claims were raised in his motion to alter or amend the June 27, 2012 state district court order denying an evidentiary hearing on most of his postconviction claims. (*See generally* Filing No. 32; Filing No. 33.) The state district court overruled Cook's motion to alter or amend. (Filing No. 15-27 at CM/ECF p. 6.) Thus, Cook's motion to alter or amend does not save the procedural default of any of Cook's habeas claims.

## I.  Pro Se Supplemental Briefs in Postconviction Appeals

Cook argues that his claims are not procedurally defaulted because they were raised in his pro se supplemental briefs in the postconviction appeals. (*See, e.g.*, Filing No. 1 at CM/ECF pp. 22, 24.)

In the interlocutory postconviction appeal, Cook never properly filed a pro se supplemental brief. Rather, Cook filed a motion for leave to file a pro se supplemental brief (filing no. 15-13), and the Nebraska Supreme Court overruled his motion *without prejudice* (filing no. 15-5 at CM/ECF p. 1). Despite an opportunity to do so, Cook never filed a pro se supplemental brief or filed another request to file such brief before the Nebraska Supreme Court issued its opinion in the interlocutory postconviction appeal. Instead, Cook attached a copy of his pro se supplemental brief to his pro se brief in support of a motion for rehearing of the Nebraska Supreme Court's decision. (Filing No. 15-17.) The court struck Cook's pro se brief and overruled the motion for rehearing. (Filing No. 15-5 at CM/ECF pp. 2, 4.) In the final postconviction appeal, the Nebraska Supreme Court overruled Cook's motion for leave to file a pro se supplemental brief. (Filing No. 15-6 at CM/ECF p. 2.)

Thus, the record demonstrates that the claims in Cook's pro se supplemental briefs were never properly presented to, or considered by, the Nebraska Supreme Court in the postconviction appeals. Accordingly, Cook cannot rely on his pro se supplemental briefs to overcome the procedural default of any habeas claims.

## J. Cause and Prejudice

### 1. Ineffective Assistance of Appellate Counsel

To the extent Cook argues that the procedural default should be excused because counsel was deficient in failing to raise the constitutional claims on direct appeal, "[a] claim of ineffective assistance of counsel must be presented to the state court as an independent claim before it may be used to establish cause for procedural default or denominated as a ground for habeas relief." *Leggins v. Lockhart*, 822 F.2d 764, 768 n.5 (8th Cir. 1987). An ineffective assistance of counsel claim asserted as cause for another procedurally defaulted federal claim can itself be procedurally defaulted, and, unless the state prisoner can satisfy the cause and prejudice standard for the procedurally defaulted ineffective assistance of counsel claim, that claim

cannot serve as cause for another procedurally defaulted claim. *Edwards v. Carpenter*, 529 U.S. 446, 451-53 (2000).

As discussed above, Cook did not properly present any ineffective assistance of appellate counsel claims to the Nebraska Supreme Court in either postconviction appeal. Therefore, Cook cannot establish cause for the procedural default of any of his claims based on ineffective assistance of appellate counsel.

### 2. Ineffective Assistance of Postconviction Counsel

Cook argues that the ineffectiveness of his postconviction counsel excuses any procedural defaults pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012). (*See, e.g.*, Filing No. 1 at CM/ECF pp. 20-23; Filing No. 32 at 4-6, 10, 18, 20-29, 33, 38-41, 44, 47-48, 51, 53; Filing No. 33 at CM/ECF p. 2; *see also* Filing No. 10 at CM/ECF p. 9.)

*Martinez*'s narrow exception to the procedural default doctrine does not save any of Cook's defaulted claims. In *Martinez*, the Supreme Court held that "[i]nadequate assistance of counsel [or the absence of counsel] at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 566 U.S. at 9. However, the *Martinez* exception applies only to defaulted claims of ineffective assistance of trial counsel, not to any other kind of trial error or to ineffective assistance of direct-appeal counsel. *Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017) (emphasizing that *Martinez* "provides no support for extending its narrow exception to new categories of procedurally defaulted claims"); *Dansby v. Hobbs*, 766 F.3d 809, 832-34 (8th Cir. 2014). Furthermore, the Supreme Court's *Martinez* decision regarding ineffective assistance of postconviction counsel and the fact that under limited circumstances the ineffectiveness of postconviction counsel may provide cause for a default does not apply here because Nebraska's collateral review process was not the first opportunity Cook had to raise the ineffective assistance of trial counsel claims as

Cook had separate counsel on the direct appeal. *See Dansby*, 766 F.3d at 834; *Pigee v. Frakes*, No. 4:17CV3157, 2018 WL 2120326, at \*6 & n.3 (D. Neb. May 8, 2018).

## K.  Fundamental Miscarriage of Justice

Finally, Cook has failed to excuse his defaulted claims by showing that there would be a fundamental miscarriage of justice if the court does not consider the claims.

To establish a fundamental miscarriage of justice, a petitioner must "show, based on new evidence, that a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Brownlow v. Groose*, 66 F.3d 997, 999 (8th Cir. 1995) (quoting *Schlup*, 513 U.S. at 327). To obtain review of an otherwise procedurally barred claim based on actual innocence, a petitioner must satisfy a two-part test: (1) the "allegations of constitutional error must be supported with new reliable evidence not available at trial"; and (2) "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Nash v. Russell*, 807 F.3d 892, 899 (8th Cir. 2015) (citing *Schlup*, 513 U.S. at 327-28); *accord Amrine v. Bowersox*, 238 F.3d 1023, 1029 (8th Cir. 2001). Actual innocence means factual innocence, not legal innocence or legal insufficiency. *Narcisse v. Dahm*, 9 F.3d 38, 40 (8th Cir. 1993). The Eighth Circuit has determined that the actual innocence "standard is strict; [and] a party generally cannot demonstrate actual innocence where there is sufficient evidence to support a conviction." *Wadlington v. United States*, 428 F.3d 779, 783 (8th Cir. 2005).

Cook has presented no new, reliable evidence of actual innocence in this case. He provides no "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence," *Schlup*, 513 U.S. at 324, to demonstrate his claim's credibility. Moreover, there is no indication that any of the evidence he has presented is new information that "was not available at trial and could not have been discovered earlier through the exercise of due diligence." *Amrine*, 238 F.3d at 1028.

Indeed, Cook does nothing more than rehash the evidence and arguments presented at trial. The court has carefully examined the record; the evidence was sufficient to convict Cook beyond a reasonable doubt. Thus, the court finds Cook has not satisfied the requisite elements to excuse his procedurally defaulted claims through any "gateway" claim of actual innocence.

## V. CERTIFICATE OF APPEALABILITY

A petitioner cannot appeal an adverse ruling on his petition for writ of habeas corpus under § 2254 unless he is granted a certificate of appealability. 28 U.S.C. § 2253(c)(1); 28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22(b)(1). The standards for certificates (1) where the district court reaches the merits or (2) where the district court rules on procedural grounds are set forth in *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). The court has applied the appropriate standard and determined that Cook is not entitled to a certificate of appealability.

IT IS THERFORE ORDERED that:

1. The Petition for Writ of Habeas Corpus (filing no. 1) is denied and dismissed with prejudice. No certificate of appealability has been or will be issued.

2. Petitioner's pending motion for discovery (filing no. 41) is denied as moot.

3. Judgment will be issued by separate document.

Dated this 18th day of May, 2020.

BY THE COURT:

*Richard G. Kopf*

Richard G. Kopf
Senior United States District Judge